# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION<br>777 6th Street NW, Suite 700<br>Washington, D.C. 20001<br><br>*Plaintiff,*<br><br>v.<br><br>RYAN ZINKE, in his official capacity as Secretary of the Interior,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>U.S. DEPARTMENT OF THE INTERIOR,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>BRIAN STEED, in his official capacity as the Deputy Director, Programs and Policy, exercising the authority of the Director of the Bureau of Land Management,<br>1849 C Street NW<br>Washington, D.C. 20240, and<br><br>THE BUREAU OF LAND MANAGEMENT,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>*Defendants.* | Case No. _____ |

# COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff National Parks Conservation Association ("NPCA") alleges the following:

## INTRODUCTION

1.      NPCA brings this action against the U.S. Department of Interior ("Interior"), Bureau of Land Management ("BLM"), and appropriate public officials (the BLM, Interior, and the public officials being collectively referred to as the "Defendants") seeking redress for: (1) Interior's Solicitor's Opinion M-37048 ("2017 Solicitor's Opinion") erroneously concluding that the rights-of-way granted to railroad companies under the General Railroad Right of Way Act of 1875, 43 U.S.C. § 934 ("1875 Right of Way Act") include the right to lease portions of their easements to third parties without a permit under FLPMA for uses that do not derive from or further a railroad purpose, therefore avoiding federal environmental review; and (2) the BLM's decision that the construction and operation of a 43-mile long pipeline associated with the Cadiz, Inc. project within the Mojave Trails National Monument may proceed without a Federal Land Policy and Management Act ("FLPMA") permit, and without complying with federal environmental review requirements pursuant to the National Environmental Policy Act ("NEPA").

2.      On September 1, 2017, Daniel H. Jorjani, the Acting Solicitor and Principal Deputy Solicitor of the Department of the Interior, distributed a memorandum erroneously concluding that "the rights-of-way granted to railroad companies under the 1875 Right of Way Act include the right to lease portions of their easement to third parties without BLM permit or grant, provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad" regardless of whether the easement derives from or furthers a railroad purpose.

3.      A subsequent Instruction Memorandum (IM No. 2018-014) directs BLM employees to "no longer take an active role in reviewing existing or proposed uses within 1875 [Right of Way] Act R[ights] O[f] W[ay]."

4.      Subsequently, on October 13, 2017, the BLM sent Cadiz, Inc. a letter ("2017 BLM Determination") erroneously concluding the proposed Cadiz, Inc. water conveyance pipeline and associated facilities ("Cadiz Project") falls within the scope of Arizona & California Railroad's ("ARZC Railroad") right of way granted under the authority of the 1875 Right of Way Act, and that Cadiz, Inc. may construct and operate the pipeline without a FLPMA permit.

5.      In derogation of its duties to properly manage the public lands, BLM determined that the Cadiz Project falls within the scope of the ARZC Railroad's 1875 Right of Way Act right of way. Thus, Defendants have failed to abide by their statutorily required duties under FLPMA and the National Environmental Policy Act.

6.      FLPMA, 43 U.S.C. §§ 1701 *et seq*., established that it is the policy of the United States that the public lands be retained in Federal ownership and that the Secretary of the Interior ("Secretary") shall manage the public lands through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate. FLPMA § 1761(a)(1) states that the Secretary is authorized to grant rights-of-way through public lands for the placement of water pipelines.

7.      NEPA, 42 U.S.C. §§ 4321 *et seq*., requires federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c).

8.      NPCA has been and will be directly harmed by the 2017 Solicitor's Opinion with regard to the conclusion that the 1875 Right of Way Act allows railroad companies to lease

portions of their easements to third parties without permit or grant from BLM, provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad.

9.     NPCA has been and will be directly harmed by the illegal 2017 BLM Determination with regard to the determination that the Cadiz Project pipeline falls within the scope of rights granted to the ARZC pursuant to the 1875 Right of Way Act, and therefore does not require authorization from BLM.

10.     For these reasons and those set forth below, the Defendants' conclusion that the Cadiz Project falls within the scope of the ARZC Railroad's 1875 Right of Way Act right of way is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and "without observance of procedure required by law," within the meaning of the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Accordingly, this Court should find and declare that the Defendants' 2017 Solicitor's Opinion described herein is contrary to law, find and declare that the Defendants' 2017 BLM Determination that the Cadiz Project falls within the scope of the ARZC Railroad's ROW described herein is contrary to law and violates FLPMA and NEPA, set aside the 2017 Solicitor's Opinion and the 2017 BLM Determination and remand consistent with the requirements of the 1875 Right of Way Act, and enjoin Defendants from authorizing project construction and operation until they have fully complied with all of their obligations under federal law including FLPMA and NEPA.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (civil action in which claims arise pursuant to a federal question) and 28 U.S.C. § 1346 (United States as a Defendant). An actual and justiciable controversy exists and claims arise

under the APA which together with the Declaratory Judgment Act provide remedies against the

Defendants, including injunctive and declaratory relief.

12.     Plaintiffs have exhausted all administrative remedies.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A) because this

is an action in which the Defendants are officers and employees of the United States acting in

their official capacities and the Defendants reside in this judicial district.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because a

substantial part of the events or omissions giving rise to this claim has occurred within this

judicial district.

15.     The 2017 Solicitor's Opinion was issued and authored by the Acting Solicitor in

Washington, D.C. Additionally, pursuant to a March 29, 2017 Instruction Memorandum (IM No.

2017-060), "[a]ll issues related to addressing activities within railroad rights-of-way granted

pursuant to the General Railroad Rights-of-Way Act of March 3, 1875 across Bureau of Land

Management (BLM)-managed lands are to be directed to the BLM Washington Office, Energy,

Minerals and Realty Management (WO-300) directorate." Therefore, the 2017 BLM

Determination was made in Washington, D.C.

## PARTIES

16.     Plaintiff National Parks Conservation Association is a nonpartisan non-profit

organization headquartered in Washington, D.C. whose mission is to provide an independent

voice for protecting and enhancing America's National Park System for present and future

generations. NPCA has over 1.3 million members and supporters nationwide.

17.     NPCA members use, enjoy, and work to preserve and protect the National Park

System and other protected federal lands with an ecological, management, or other nexus to

National Parks including Mojave Trails National Monument. NPCA and its members are actively engaged in protecting the viewsheds, soundscapes, airsheds, watersheds, and other values that make Mojave Trails National Monument unique and worthy of protection for the American people.

18.     NPCA has been, is, and will continue to be adversely affected and irreparably injured by the 2017 Solicitor's Opinion. The 2017 Solicitor's Opinion allows both known and unknown parties to use federal lands for commercial and industrial purposes without any federal environmental review.

19.     NPCA has been, is, and will continue to be required to divert its organizational resources to monitor 1875 Act rights of way through protected federal lands with an ecological, management, or other nexus to National Parks to ensure uses in the rights of way comply with federal law and do not negatively impact those lands.

20.     NPCA has been, is, and will continue to be adversely affected and irreparably injured by BLM's illegal determination that the Cadiz Project pipeline may proceed without environmental review or authorization by BLM. The interests of NPCA's members described above will be injured not only by the noise, pollution, and adverse impacts to plants and wildlife associated with construction, operation, and maintenance of the Cadiz Project pipeline, but also by the expected draw-down of the Fenner, Bristol, and Cadiz basins that will result from operation of the Cadiz Project. *See* February 23, 2000 U.S. Geological Survey Letter and February 28, 2000 National Park Service Letter (finding Cadiz, Inc. overestimated the natural groundwater recharge to the basin by 5 to 25 times).

21.     NPCA members have and will take personal and professional trips for hiking, birding, sight-seeing, and observing wildlife and plants to the Cadiz Dunes, Cadiz Road, and

other areas that will be affected by the construction, operation, and maintenance of the Cadiz Project pipeline.

22.     NPCA members have visited freshwater springs near the Cadiz Project, including Bonanza Springs, to observe rare plants and animals and find solace and renewal, and they intend to continue to do so in the future. Plaintiffs' members derive professional, aesthetic, recreational, and educational enjoyment from the natural ecosystems that these desert springs and other riparian areas support. These interests will be harmed by the drawdown of these springs because NPCA members will no longer be able to observe these natural ecosystems.

23.     NPCA is a non-profit advocacy organization whose primary mission is to address major threats facing the National Park System and other protected federal lands with an ecological, management, or other nexus to National Parks. As part of its work, NPCA and its members advocated for, and participated in the efforts to create the Mojave Trails National Monument.

24.     NPCA's mission has been, is, and will continue to be frustrated by BLM's erroneous determination regarding the Cadiz Project pipeline. NPCA has been, is, and will continue to be required to divert its organizational resources to ensure that the Cadiz Project complies with federal law.

25.     Defendant Brian Steed is Deputy Director, Programs and Policy, exercising the authority of the Director of the Bureau of Land Management. He is sued in his official capacity.

26.     Defendant Bureau of Land Management is an administrative agency within the Department of Interior responsible for managing the public land underlying much of the ARZC Railroad right of way through which the Cadiz Project pipeline is proposed to be built.

27. Defendant Department of the Interior is statutorily charged with administration of the public lands under 43 U.S.C. §§ 1701 *et seq*.

28. Defendant Ryan Zinke is Secretary of the Interior. He is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### General Railway Right of Way Act of 1875 (43 U.S.C §§ 934 – 939)

29. The 1875 Right of Way Act, 43 U.S.C. §§ 934-939, authorized a right of way through the public lands of the United States "to any railroad company duly organized … to the extent of one hundred feet on each side of the central line of said road." 43 U.S.C. § 934.

30. The 1875 Right of Way Act granted railroads "the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road." *Id.*

31. Rights-of-way granted pursuant to the 1875 Right of Way Act are easements over the land for "railroad purposes." *See Marvin M. Brandt Revocable Tr. v. United States*, 134 S. Ct. 1257, 1264-169 (2014); *Great N. R. Co. v. United States*, 315 U.S. 262, 272 (1942) (holding "[t]he [1875] Act was designed to permit the construction of railroads through the public lands...."); *United States v. Union Pac. R. Co.*, 353 U.S. 112, 119 (1957) (holding "only an easement for railroad purposes was granted" by post-1871 grant).

32. The 1875 Right of Way Act stands in contrast to earlier, so-called pre-1871 congressional grants to railroads, in that pre-1871 congressional grants were grants of "limited fee." *N. Pac. Ry. Co. v. Townsend*, 190 U.S. 267, 271 (1903) (holding "[i]n effect the [pre-1871

grant] was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted").

33.     Any use by a railroad within an 1875 Right of Way Act right of way that is not for or in furtherance of a "railroad purpose" is beyond the scope of the right of way and therefore requires permission from the servient estate.

## Department of the Interior Guidance on 1875 Act Rights of Way

34.     In just the past twenty-eight years, Interior has changed its position regarding the scope of 1875 Right of Way Act rights of way at least three times, as explained more fully below:

### United States Department of the Interior 1989 Solicitor's Opinion (M-36964)

35.     In 1989, the Interior Solicitor issued Solicitor Opinion M-36964 ("1989 Solicitor's Opinion"), which concluded "[u]nder the 1875 Right of Way Act, railroads were granted an 'easement.' The scope of this easement, unlike an ordinary common-law easement, is an interest tantamount to fee ownership, including the right to use and authorize others to use (where not inconsistent with railroad operations) the surface, subsurface, and airspace. The grantee's rights to use and occupy the surface are exclusive."

### United States Department of the Interior 2011 Solicitor's Opinion (M-37025)

36.     In 2011, the Interior Solicitor issued M-37025 ("2011 Solicitor's Opinion), which was a comprehensive analysis of the 1875 Right of Way Act based on a thorough examination of the relevant statutory language and case law. The 2011 Solicitor's Opinion found parts of the 1989 Solicitor's Opinion inconsistent with the 1875 Right of Way Act, partially withdrew the 1989 Solicitor's Opinion, and stated:

> [w]ithin an 1875 Right of Way Act ROW, a railroad's authority to undertake or authorize activities is limited to those activities that *derive from or further a*

> *railroad purpose*, which allows a railroad to undertake, or authorize others to undertake, activities that have both railroad and commercial purposes, but does not permit a railroad to authorize activities that bear no relationship to the construction or operation of a railroad.

(emphasis added)

## United States Department of the Interior 2014 Instruction Memorandum (IM. No. 2014-122)

37.     On August 11, 2014, the BLM released the 2014 Instruction Memorandum No. 2014-122 ("2014 Instruction Memorandum"), which provided directions to BLM Field Office Officials on how to evaluate whether a particular activity within an 1875 Right of Way Act right of way derives from or furthers a railroad purpose as described in the 2011 Solicitor's Opinion.

38.     The case-by-case evaluation described in the 2014 Instruction Memorandum directed BLM Field Office Officials to consider the following factors in determining whether a proposed activity within an 1875 Right of Way Act right of way derives from or furthers a railroad purpose:

(1) The specific purpose of the 1875 Right of Way Act, which was to give railroads the exclusive right to use and occupy the granted ROW for railroad purposes.

(2) The concept that, even though railroad ROW grants are generally broadly construed, any doubts about the scope of such grant are still to be resolved in the Government's favor.  As a practical matter, this means that a railroad ROW holder and/or the party arguing that a particular activity is within the scope of an 1875 Right of Way Act ROW must provide sufficient evidence to overcome any doubts as to whether a particular activity is within the scope of the ROW.

(3) The relationship between the activity and the railroad – e.g., does the activity in question originate or issue from, help promote, and/or advance the railroad purposes?

(4) Historical industry practice with respect to the activity in question – e.g., is the proposed activity one that has been used by railroads previously in furtherance of a railroad purpose?

9

## United States Department of the Interior March 2017 Instruction Memorandum (IM No. 2017-060)

39.     On March 29, 2017, BLM issued Instruction Memorandum No. 2017-060 (IM 2017-060). IM 2017-060 rescinded the 2014 Instruction Memorandum and directed that "[a]ll issues related to addressing activities within railroad rights-of-way granted pursuant to the [1875 Act] across [BLM]-managed lands are to be directed to the BLM Washington Office."

## United States Department of the Interior 2017 Solicitor's Opinion (M-37048)

40.     On September 1, 2017, Daniel H. Jorjani, the Acting Solicitor and Principal Deputy Solicitor of the Department of the Interior, distributed a memorandum with the subject "Withdrawal of Solicitor's Opinion M-37025 issued on November 4, 2011, and Partial Withdrawal of Solicitor's Opinion M-36964 issued on January 5, 1989" ("2017 Solicitor's Opinion")

41.     Contrary to long standing precedent and reversing the position of the prior administration, the Acting Solicitor concluded that "the rights-of-way granted to railroad companies under the 1875 Right of Way Act include the right to lease portions of their easement to third parties without BLM permit or grant, provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad" regardless of whether the easement derives from or furthers a railroad purpose.

## United States Department of the Interior 2017 Instruction Memorandum (IM No. 2018-014)

42.     On November 27, 2017, the BLM released the 2017 Instruction Memorandum No. 2018-014, titled "Third-Party Uses on Railroad Rights-of-Way under the General Railroad Right-of-Way Act of March 3, 1875."

43.     The 2017 Instruction Memorandum states that the policy of the BLM is that "an authorization from the BLM for existing or proposed uses within 1875 Act ROWs, including third-party uses, is generally unnecessary."

44.     Additionally, "[c]onsistent with the conclusions of Opinion M-37048," the 2017 Instruction Memorandum directs BLM employees to "no longer take an active role in reviewing existing or proposed uses within 1875 Act ROWs."

## Federal Land Policy and Management Act of 1976 (43 U.S.C. §§ 1701 *et seq.*)

45.     FLPMA is a comprehensive statute designed to ensure that public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

46.     In passing FLPMA, Congress declared it to be the policy of the United States that "public lands be retained in Federal ownership"; "public lands not previously designated for any specific use … be reviewed in accordance with the provisions of [the] Act"; "judicial review of public land adjudication decisions be provided by law"; "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values"; "the United States receive fair market value of the use of the public lands and their resources"; and "uniform procedures for any disposal of public land … be consistent with the prescribed mission of the department or agency involved." 43 U.S.C. § 1701(a)(1), (3), (6), (8), (9), (10).

47.     FLPMA prescribes multiple directives to the Secretary of the Interior including that the Secretary: (1) manage the public lands "through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate …" 43 U.S.C. §

1732(b); (2) "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b); (3) "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values …" 43 U.S.C. § 1711(a); and (4) "ascertain the boundaries of the public lands …." 43 U.S.C. § 1711(b).

48.     FLPMA authorizes the Secretary of Interior "to grant, issue, or renew rights-of-way over, upon, under, or through" land administered by BLM for, among other things, "pipelines . . . for the . . . transportation or distribution of water." 43 U.S.C. § 1761 (a)(1).

49.     FLPMA provides that "no right of way for the purposes listed in this subchapter shall be granted, issued, or renewed over, upon, under, or through such lands except under and subject to the provision, limitations, and conditions of this subchapter." 43 U.S.C. § 1770(a).

50.     FLPMA prohibits BLM from authorizing or allowing anyone to construct or operate a water pipeline on federal public land within its jurisdiction unless (1) BLM grants a right-of-way in accordance with the procedural and substantive provisions of FLPMA or (2) the water pipeline falls within the scope of a right-of-way granted by the United States prior to FLPMA's enactment. *See* 43 U.S.C. § 1770(a).

51.     Regulations promulgated by the Secretary of Interior under FLPMA make clear:

[An applicant] must have a grant under this part when you plan to use public lands for systems or facilities over, under, on, or through public lands. These include, but are not limited to: . . . pipelines . . . and other systems which impound, store, transport, or distribute water.

43 C.F.R. § 2801.9(a)(1).

52.     Prior to obtaining a right of way for a water pipeline under FLPMA, the applicant must submit substantial analysis, and the Secretary of Interior, acting through BLM, must make a number of findings. For example, "prior to granting or issuing a right of way . . . for a new project which may have a significant impact on the environment," BLM "shall require the

applicant to submit a plan for construction, operation, and rehabilitation for such right of way." 43 U.S.C. § 1764(d).

53.     When granting rights-of-way, BLM is authorized to include terms, conditions, and stipulations it determines to be in the public interest, which may include modifying the proposed use or changing the route or location of the proposed facilities. 43 C.F.R. § 2805.10(a)(1).

54.     Additionally, in order to protect "historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources that are uniquely located" in the California desert, Congress established the 25-million acre California Desert Conservation Area ("CDCA"). 43 U.S.C. § 1781(c). Congress required the Secretary to prepare a management plan for the CDCA which would take into account "maintenance of environmental quality [and] rights-of-way."

55.     The CDCA was subsequently amended by two other regional planning endeavors, the Northern and Eastern Colorado Desert Coordinated Management Plan (NECO Plan), and the Desert Renewable Energy Conservation Plan (DRECP).

56.     In deciding whether to grant a right of way, BLM must also comply with the existing land and resource management plans, including the CDCA Plan, as amended by the NECO Plan and the DRECP.

## National Environmental Policy Act (42 U.S.C. §§ 4321 *et seq.*)

57.     The National Environmental Policy Act is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental

information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c).

58.     To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—an EIS—for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). An EIS must describe: (1) "the environmental impact of the proposed action"; (2) "the adverse environmental effects which cannot be avoided"; and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii). The environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b).

59.     NEPA implementing regulations define a "major federal action" as one "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

60.     NEPA implementing regulations further prescribe that:

Federal actions tend to fall within one of the following categories: … (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based. … (4) Approval of specific projects … [which] include actions approved by permit or *other regulatory decision* as well as federal and federally assisted activities.

40 C.F.R. § 1508.18(b)(2), (4) (emphasis added).

61.     The Department of the Interior Manual indicates that "[a]n EIS level analysis should be completed when an action meets either of the two following criteria:

If the impacts of a proposed action are expected to be significant; or (2) In circumstances where a proposed action is directly related to another action(s), and cumulatively the effects of the actions taken together would be

significant, even if the effects of the actions taken separately would not be significant.

Interior Department Manual, Chapter 11.8(A)(1-2).

62.     The Department of the Interior Manual states that "[r]ights-of-way for … pipelines" will normally require the preparation of an EIS. *Id*. at 11.8(B)(5)(b).

## **Presidential Proclamation – Establishment of the Mojave Trails National Monument Proclamation No. 9395**

63.     On February 12, 2016, President Barack Obama established the Mojave Trails National Monument by presidential proclamation, pursuant to the Antiquities Act of 1906, 54 U.S.C. § 320301. Proclamation No. 9395, 81 Fed. Reg. 8,371 (February 12, 2016) (Establishment of the Mojave Trails National Monument).

64.     The Proclamation describes Mojave Trails National Monument as "a stunning mosaic of rugged mountain ranges, ancient lava flows, and spectacular sand dunes." The Proclamation finds that the Monument is "an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists, archaeologists, and historians for generations to come." The Proclamation concludes that "protection of the Mojave Trails area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans."

65.     The Proclamation declared:

[a]ll Federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws, … other than by exchange that furthers the protective purposes of the monument or disposal for the limited purpose of providing materials for repairing or maintaining roads and

bridges within the monument consistent with care and management of the objects identified ....

*Id*.

66.     The Proclamation identified various "objects" to be protected including geological, biological, ecological, historical, and paleontological resources. Specifically, the proclamation identifies:

> [t]he area's scarce springs and riparian areas such as Afton Canyon, Chuckwalla Spring, Hummingbird Spring, Barrel Spring, and Fenner Spring [which] provide refuges for a wide variety of plants and animals. The complex network of groundwater underlying the Mojave Trails area has been the subject of past and ongoing hydrological study. Underground aquifers feed springs and seeps that are important for sensitive ecosystems and wildlife, though specific connections are not yet well understood.

*Id*.

67.     The Proclamation recognizes the importance of maintaining sufficient water resources to support the plants and animals that inhabit these desert lands, and it requires the Secretary of Interior to "work with appropriate State officials to ensure the availability of water resources, including groundwater resources, needed for monument purposes."

68.     The designation of Mojave Trails National Monument immediately codified enhanced protection for the identified "objects of historic or scientific interest" and for the land on which they are found. 54 U.S.C. § 320301(a). Once designated as a national monument, those lands must be managed for the purpose of preserving and safeguarding the objects of scientific and historic interest located there. The protection of the identified objects of historic or scientific interest is the paramount purpose for which the land is to be managed.

69.     Once a national monument has been established, it becomes part of the National Landscape Conservation System. 16 U.S.C. § 7202(b)(1)(A).

70.     Under the National Landscape Conservation System Act ("NLCSA"), the

Secretary has additional obligations to manage the system "in a manner that protects the values

for which the components of the system were designated." 16 U.S.C. § 7202(c)(2).

## Administrative Procedure Act (5 U.S.C. §§ 701–706)

71.     The Administrative Procedure Act, 5 U.S.C. §§ 701-706, provides a cause of

action to challenge any final agency action taken pursuant to any statute where the action is made

reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

72.     An agency action is final if: (1) "the action mark[s] the consummation of the

agency's decision-making-process-it must not be of a merely tentative or interlocutory nature;

and (2) the action [is] one by which rights or obligations have been determined, or from which

legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations

and quotations omitted).

73.     Under the APA, a reviewing court shall set aside agency actions, findings, or

conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law, or when they are adopted "without observance of procedure required by

law." 5 U.S.C. § 706(2)(A), (D).

74.     An agency action is arbitrary and capricious if the agency "relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency," or if the agency's decision "is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm

Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, "an agency changing course" is

"obligated to supply a reasoned analysis for the change" beyond what would be required if the agency were operating on a clean slate. *Id*. at 42.

75.     The APA also authorizes a reviewing court to compel agency action that is unlawfully withheld. 5 U.S.C. § 706(1).

## FACTUAL ALLEGATIONS

### The ARZC Railroad Right of Way

76.     Beginning in the 1850s, recognizing the importance of westward expansion, Congress began granting railroad companies rights of way through the public domain, accompanied by outright grants of land along those rights of way. *Great N. R. Co. v. United States*, 315 U.S. 262, 273 (1942).

77.     These grants, totaling about 125 million acres of land, became unpopular among the public who wanted to see the land reserved for homesteaders instead of being given to the railroads.

78.     As the Supreme Court has recognized as a great shift in policy, Congress, responding to the public sentiment against the land grants, passed the 1875 Right of Way Act, which granted railroads only easements for railroad purposes.

79.     Around 1910, the predecessor of the ARZC Railroad was granted a right of way under the authority of the 1875 Right of Way Act ("ARZC 1875 ROW").

80.     The ARZC 1875 ROW includes portions of a 43-mile-long, 200-foot-wide strip of land between Cadiz, CA and Parker, AZ.

### The Cadiz Project

81.     In 1983, Cadiz, Inc. purchased 11,000 acres of land in the Mojave Desert for agricultural development. In the subsequent years, Cadiz, Inc.'s property interest has grown to more than 35,000 acres in the Cadiz Valley.

82.     In 1998, Cadiz, Inc. began developing a water supply and storage project, the "Cadiz Groundwater Storage and Dry-Year Supply Program," which was ultimately thwarted when the Metropolitan Water District of Southern California declined to move forward with the project citing potential environmental impacts as well as financial uncertainty. *See* Metropolitan Water District Board Meeting Agenda, October 8, 2002.

83.     In 2008, Cadiz, Inc. redesigned and relabeled its plans for a water supply and storage project launching the "Cadiz Valley Water Conservation, Recovery & Storage Project" ("the Cadiz Project").

84.     The Cadiz Project would pump up to sixteen-billion gallons of water per year from a desert aquifer that supports springs, seeps, and riparian areas within federal public lands with enhanced statutory protections including the Mojave Trails National Monument, Mojave National Preserve, Joshua Tree National Park, and the CDCA.

85.     These enhanced statutory protections include the Park System Resource Protection Act, 54 U.S.C. § 100723 (b)(1) and the NLSCA.

86.     The Park System Resource Protection Act directs the Secretary to "undertake all necessary actions to: (1) prevent or minimize the destruction, loss of, or injury to System unit resources; or (2) minimize the imminent risk of destruction, loss, or injury to System unit resources.").

87.     The NLSCA states the Secretary has additional obligations to manage the system "in a manner that protects the values for which the components of the system were designated."

88.     In 2000, the U.S. Geological Survey (USGS) reviewed hydraulic modeling done by Cadiz, Inc. that purports to show the Fenner, Bristol, and Cadiz watersheds receive 50,000 acre-feet of water each year through natural precipitation run-off. USGS concluded that modeling done by Cadiz, Inc. was "not defensible" and had overestimated the natural recharge rate by 5 to 25 times.

89.     Cadiz plans to transport the water to users via a 43-mile long, seven-foot diameter pipeline that would connect the Cadiz, Inc. property to the California River Aqueduct, near Rice, CA.

90.     According to Cadiz, Inc., the 43-mile water conveyance pipeline will be buried within the ARZC 1875 ROW, as explained more fully below.

**The ARZC Railroad's Lease to Cadiz, Inc.**

91.     The ARZC Railroad entered into a lease agreement in November 2008 ("2008 Lease") with Cadiz, Inc. purporting to allow Cadiz, Inc. to use its 1875 ROW for a water conveyance pipeline and other facilities in San Bernardino County, California from the vicinity of the Iron Mountain Pumping Plant on the Colorado River Aqueduct to the point where the ARZC Railroad's rail line crosses the Cadiz, Inc.'s properties in the Cadiz and Fenner Valleys. A map of the proposed pipeline route is included below.



92.     The 2008 Lease grants Cadiz, Inc. the right to lease:

(a) an area of the [the ARZC Railroad] Property approximately fifteen feet (15')
wide and approximately fifteen feet (15') deep, located more than fifty feet (50')
northeasterly from the centerline of the existing railroad track to install, construct,
operate, maintain, repair, renew and remove one (1) underground water
conveyance pipeline approximately seven feet (7') in diameter; (b) as many as
four (4) areas of the Property of sufficient size to install, construct, operate,
maintain, repair, renew and remove underground manifold pipelines
approximately twenty-four inches (24") to thirty-six inches (36") in diameter, that
will cross beneath the existing railroad track; (c) an area of the Property located
more than seventy-five feet (75') southwesterly from the center line of the
existing railroad track of sufficient size to install, construct, operate, maintain,
repair, renew and remove electrical power poles designed to support an overhead
electrical power line or, alternatively, to install, construct, operate, maintain,
repair, renew and remove an underground electrical power line.

93.     Approximately one month following the issuance of the 2011 Solicitor's Opinion

which concluded that a railroad's authority to undertake or authorize activities is limited to those

activities that *derive from or further a railroad purpose*, Cadiz, Inc. and the ARZC Railroad

amended the 2008 Lease to include several purported railroad uses. The amendment obliged

Cadiz to dedicate approximately two percent of the Project's water for these purported uses.

94.    On October 2, 2015, the California State Director of the BLM issued an

administrative determination ("2015 Administrative Determination") that ARZC Railroad cannot

authorize the proposed Cadiz Project because it does not derive from or further a railroad

purpose and "is outside the scope of [the ARZC Railroad]'s [right of way] grants held under the

1875 Act." "In order to proceed with the proposed [Cadiz] Project," the Bureau stated that

"Cadiz, Inc., [the ARZC Railroad], or other parties involved will require . . . authorization for a

right of way for the [Cadiz] Project under regulations set forth in 43 C.F.R. Part 2800."

95.    On March 14, 2016, Cadiz, Inc. made available its "Form 10-K Annual Report

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended

December 31, 2015." Therein, Cadiz, Inc. stated that "if the BLM will not change [the 2015

Administrative Determination], then [Cadiz, Inc.] will need to file a right-of-way permit

application with the BLM for a review of the pipeline's use. . . and/or seek to clarify a railroad's

property rights in U.S. Federal Court. Both alternatives will likely result in a delay of final

Project implementation and we cannot reasonably predict the outcome of either process."

96.    On March 30, 2017, the Acting Assistant Director, Energy, Minerals, and Realty

Management of the BLM issued IM 2017-060 which rescinded the 2014 Instruction

Memorandum and directed all issues related to addressing activities within railroad rights-of-way

granted pursuant to the 1875 Right of Way Act to its Washington, D.C. office.

97.    On September 1, 2017, the Department of the Interior's Solicitor's Office issued

Solicitor Opinion M-37048 which withdrew M-37025 and incorrectly concluded that:

the rights-of-way granted to railroad companies under the 1875 Right of Way Act include the right to lease portions of their easement to third parties without BLM permit or grant, provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad.

98.     On October 13, 2017, BLM advised Cadiz, Inc., by letter, expressly superseding the 2015 Administrative Determination, that the BLM had determined that the Cadiz Project is "within the scope" of the 1875 ROW because it would "not interfere with the continued use of the easement for railroad operations, nor would the proposed activities extend beyond the surface of the easement, broadly defined."

99.     In this 2017 BLM Determination, BLM further concludes in the alternative that "that the Cadiz Project would further a railroad purpose consistent with the historical understanding of the incidental use doctrine."

100.    The 2017 BLM Determination, finding "authorization by the BLM … unnecessary," marked the culmination of Interior's involvement in the Cadiz Project and constitutes final agency action on the matter.

101.    Cadiz, Inc. issued a press release on October 16, 2017, in which it stated: "With the receipt of this definitive determination by the BLM, the Company will now turn its attention to final engineering design, contract arrangements with its participating agencies and a conveyance agreement with the Metropolitan Water District of Southern California in accordance with applicable law." The press release also stated: "no further federal permits or authorizations are required for Project construction within the ARZC railroad right-of-way."

## PLAINTIFF'S CLAIMS FOR RELIEF

## CLAIM 1 – VIOLATION OF THE APA – 2017 SOLICITOR'S OPINION

102.    Each allegation above are incorporated as if fully set forth here, by reference.

23

103.    Defendants' 2017 Solicitor's Opinion is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA, 5 U.S.C. § 704.

104.    Defendants' 2017 Solicitor's Opinion determines rights of third parties immediately by stating that "rights-of-way granted to railroad companies under the 1875 Act include the right to lease portions of their easement to third parties without BLM permit or grant."

105.    Defendants' 2017 Instruction Memorandum confirms that the 2017 Solicitor's Opinion is a final agency action and marks the consummation of the agency's decision-making process because it directs BLM employees to refrain from "reviewing existing or proposed uses within 1875 Act ROWs."

106.    Defendants' conclusion that the scope of a right of way granted under the 1875 Right of Way Act "include[s] the right to lease portions of their easement to third parties without BLM permit or grant, provided that such leases are limited to the surface, broadly defined, of the easement and do not interfere with the continued use of the easement as a railroad" is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

107.    Under longstanding jurisprudence, courts have held that a right of way granted pursuant to the 1875 Right of Way Act is an easement over the land for "railroad purposes." *See Marvin M. Brandt Revocable Tr. v. United States*, 134 S. Ct. 1257, 1264-169, 188 L. Ed. 2d 272 (2014); *Great N. R. Co. v. United States*, 315 U.S. 262, 272 (1942) (holding "[t]he [1875] Act was designed to permit the construction of railroads through the public lands..."); *United States v. Union Pac. R. Co.*, 353 U.S. 112, 119 (1957) (holding "only an easement for railroad purposes was granted" by post-1871 grant).

24

108.     Therefore, Defendants' decision that all 1875 Right of Way Act rights of way should be interpreted to allow railroads to lease portions of their easements, limited to the surface "broadly defined," for *any use* that does not interfere with the continued use as a railroad was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## CLAIM 2 – VIOLATION OF THE APA – 2017 BLM DETERMINATION

109.     Each allegation above is incorporated as if fully set forth here, by reference.

110.     The 2017 BLM Determination is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA, 5 U.S.C. § 704.

111.     Under longstanding jurisprudence, courts have held that a right of way granted pursuant to the 1875 Right of Way Act is an easement over the land for "railroad purposes." *See Marvin M. Brandt Revocable Tr. v. United States*, 134 S. Ct. 1257, 1264-169, 188 L. Ed. 2d 272 (2014); *Great N. R. Co. v. United States*, 315 U.S. 262, 272 (1942) (holding "[t]he [1875] Act was designed to permit the construction of railroads through the public lands..."); *United States v. Union Pac. R. Co.*, 353 U.S. 112, 119 (1957) (holding "only an easement for railroad purposes was granted" by post-1871 grant).

112.     BLM's conclusion that ARZC has a legal right to authorize or undertake any activity within its 1875 Act ROW "as long as the activity is incidental to and does not interfere with continued railroad operations" is not in accordance with the law.

113.     Therefore, the BLM's determination that the Cadiz Project falls within the scope of the ARZC Railroad's 1875 ROW because the Cadiz Project would not interfere with railroad operations, nor would the proposed activities extend beyond the surface of the easement, broadly defined is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

114.     BLM's alternative conclusion that the Cadiz Project is within the scope of the ARZC Railroad's 1875 ROW because "the Cadiz Project would further a railroad purpose consistent with the historical understanding of the incidental use doctrine" is likewise "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

115.     The Supreme Court has held that common law principles like the incidental use doctrine do not apply to federal right of way grants. *Townsend*, 190 U.S. at 270 (quoting *Shively v. Bowlby*, 152 U.S. 1, 44 (1894)) (holding "courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the states for their grants."); see also *Beres v. United States*, 104 Fed. Cl. 408, 443 (2012) ("federal law, not state law, controls the determination of Congressional intent as to the property interests").

116.     Therefore, BLM's decision that the Cadiz Project falls within the scope of the ARZC Railroad's 1875 ROW because "the Cadiz Project would further a railroad purpose consistent with the historical understanding of the incidental use doctrine" is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## CLAIM 3 – VIOLATION OF FLPMA – 2017 BLM DETERMINATION

117.     Each allegation above is incorporated as if fully set forth here, by reference.

118.     This Third Claim for Relief challenges BLM's violation of FLPMA. NPCA brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

119.     Under FLPMA, the Secretary must regulate the public lands through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate. 43 U.S.C. § 1732.

120.    Under the APA, the court may hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706 (2)(a).

121.    The 2017 BLM Determination constitutes a final agency action reviewable pursuant to the Administrative Procedure Act. 5 U.S.C. §§ 702 and 706.

122.    The 2017 BLM Determination finding the proposed Cadiz Project proponent did not need to apply for a FLPMA permit was contrary to law, arbitrary and capricious, and an abuse of discretion, if any such discretion was present.

123.    Because the Cadiz Project pipeline is beyond the scope of the 1875 Act rights of way held by the ARZC railroad, BLM has failed to act in accordance with law by allowing the Cadiz Project to proceed in the absence of a valid right of way or easement.

## CLAIM 4 – VIOLATION OF NEPA

124.    Each allegation above is incorporated as if fully set forth here, by reference.

125.    This Fourth Claim for Relief challenges Defendants' violations of NEPA and its implementing regulations by failing to undertake *any* environmental review of the proposed Cadiz Project. NPCA brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

126.    NEPA requires federal agencies to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). NEPA implementing regulations prescribe that "Federal actions tend to fall within one of the following categories: … (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based. … (4) Approval of specific projects … [which] include

actions approved by permit or *other regulatory decision* as well as federal and federally assisted activities." 40 CFR § 1508.18(b)(2), (4), emphasis added.

127.    Defendants violated NEPA because the 2017 BLM Determination constituted a de facto approval of the proposed Cadiz Project and Defendants failed to prepare an EIS or conduct any environmental review under NEPA. Defendant, Interior, itself notes that "[r]ights-of-way for … pipelines" will normally require the preparation of an EIS. Interior Department Manual, Chapter 11.8(B)(5)(b).

## PRAYER FOR RELIEF

**WHEREFORE**, NPCA respectfully requests that this Court:

(1) Find and declare that the Defendants' 2017 Solicitor's Opinion described herein is contrary to law;

(2) Find and declare that the Defendants' 2017 BLM Determination that the Cadiz Project falls within the scope of the ARZC Railroad's ROW described herein is contrary to law and violates FLPMA;

(3) Set aside and remand the 2017 Solicitor's Opinion, the 2017 Instruction Memorandum, and the 2017 BLM Determination consistent with the requirements of the 1875 Right of Way Act;

(4) Enjoin Defendants from authorizing Cadiz Project construction and operation until they have fully complied with all of their obligations under FLPMA and NEPA;

(5) Award NPCA its reasonable costs of litigation, including reasonable attorneys' fees and costs; and

*      *      *

28

(6) Grant NPCA such other and further relief that the Court may deem is just and proper.

Dated: April 3, 2018                    Respectfully submitted,

                                        /s/ Michael Robinson-Dorn
                                        _____

                                        Michael Robinson-Dorn (D.C. Bar No. 439257)
                                        Clinical Professor of Law &
                                        Director, Environmental Law Clinic
                                        UC Irvine School of Law
                                        P.O. Box 5479
                                        401 East Peltason Dr., Suite 1000
                                        Irvine, CA 92616
                                        mrobinsondorn@law.uci.edu
                                        (949) 824-1043

                                        *Counsel for Plaintiff, National Parks Conservation Association*