# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-6775-GW(ASx) | Date | June 21, 2019 |
|---|---|---|---|
| Title | *National Parks Conservation Association v. Ryan Zinke, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**      **IN CHAMBERS - FINAL RULINGS ON:**

   **CADIZ, INC. AND CADIZ REAL ESTATE, LLC'S MOTION FOR SUMMARY JUDGMENT [53];**

   **FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [54]**

   **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [55]**

   Attached hereto is the final ruling on the cross-motions for summary judgment. Plaintiffs are to prepare a proposed judgment remanding the matter back to the United States Bureau of Land Management.

|  | : | 25 |
|---|---|---|
| Initials of Preparer | JG | |

***Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.***; Case No. 2:17-cv-08587-GW-(ASx)
***Nat'l Parks Conserv. Ass'n v. Ryan Zinke***; Case No. 2:18-cv-06775-GW-(ASx)
Final Rulings on Cross-Motions for Summary Judgment

## I.      Background

### A.  Introduction

Both of these consolidated cases[1] relate to the United States Bureau of Land Management's (the "BLM") 2017 conclusion that a proposed water pipeline project did not require a BLM right-of-way approval because the project fell within the scope of a right-of-way granted to the Arizona California Railroad ("ARZC") under the 1875 General Railroad Right-of-Way Act (the "1875 Act"), 43 U.S.C. §§ 934-39.  The BLM's position is that, because the project was within the scope of the right-of-way, the agency did not need to approve the it and thus had no obligation to conduct the environmental review required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*

Two different sets of Plaintiffs now challenge the BLM's.  The crux of this case is therefore the range of permissible activities within an 1875 Act right-of-way.  Namely, whether activities are limited to those that further "railroad purposes," or extend to all uses so long as they do not "interfere with" the continued use of the right-of-way as a railroad.

In Case No. 17-cv-8587, Plaintiffs Center for Biological Diversity and Center for Food Safety (the "Centers") sue: 1) the BLM; 2) Ryan Zinke, Secretary of the Department of the Interior; 3) Brian Steed, the BLM's Deputy Director for Policy and Programs; 4) Jerome Perez, the BLM's California State Office Director; 5) Beth Ransel, the BLM's California Desert District Office Manager; 6) Michael Nedd, the BLM's Acting Deputy Director for Operations; and 7) Michael Ahren, the BLM's Needles Field Office Director.[2]  *See generally* First Amended Complaint

---

[1] Filings in *Ctr. for Bio. Diversity v. U.S. Bureau of Land Mgmt.*; Case No. 2:17-cv-08587-GW-(ASx), will be referenced as "17-8587 Docket No. __."  Filings in *Nat'l Parks Conserv. Ass'n v. Ryan Zinke*; Case No. 2:18-cv-06775-GW-(ASx), will be referenced as "18-6775 Docket No. __."  The two cases have been consolidated for pretrial purposes only.  *See* Minutes of Scheduling Conference, 17-8587 Docket No. 51; Minutes of Scheduling Conference, 18-6775 Docket No. 27.

[2] The individual defendants were sued in their official capacities.  Unless otherwise noted, the Court will refer to all federal defendants collectively as the "BLM."  Some of the individual defendants in this case have changed due to turnover in the BLM.  On April 5, 2019, when BLM filed its motion for summary judgement, the individual defendants were: David Bernhardt, Acting Secretary of the Department of the Interior; Brian Steed, Deputy Director, Programs and Policy, BLM; Joe Stout, Acting California State Director, BLM; Ben Gruber, Acting District Manager, California Desert District, BLM; and Michael Ahrens, Field Manager, Needles Field Office, BLM.  *See* Docket No. 54-1.

1

("FAC"), 17-8587 Docket No. 20.  The FAC asserts two causes of action: 1) for violation of the Federal Land Policy and Management Act ("FLPMA"), 35 U.S.C. §§ 1701, *et seq.*; the 1875 Act; and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500, *et seq.*; and 2) for violation of NEPA and the APA.  *See generally id.*  In Case No. 18-cv-6775, Plaintiff National Parks Conservation Association ("NPCA" and collectively with the Centers, "Plaintiffs") sues: 1) the United States Department of the Interior ("Interior"); 2) the BLM; 3) Steed; and 4) Zinke.[3]  *See generally* Complaint.  The Complaint asserts four causes of action under the APA, FLPMA, and NEPA.  *See generally id.*

After the BLM answered the operative complaints in both cases, Cadiz, Inc. and Cadiz Real Estate, LLC ("Cadiz") moved this Court for leave to intervene as defendants in both actions.  *See* Motion to Intervene, 17-8587 Docket No. 37; 18-6775 Docket No. 25.  Because Cadiz is the private entity seeking to develop the water pipeline at issue, and because Plaintiffs did not oppose, the Court granted leave for Cadiz to intervene.  *See* Minutes of Cadiz's Motion to Intervene, 17-8587 Docket No. 46; Minute Order, 18-6775 Docket No. 38.

Now the various parties cross-move for summary judgment.  *See* Centers' Motion for Summary Judgment ("Centers MSJ"), 17-8587 Docket No. 67-1; NPCA's Motion for Summary Judgment ("NPCA MSJ"), 18-6775 Docket No. 55-2; BLM's Motion for Summary Judgment ("BLM MSJ"), 18-6775 Docket No. 54-1; Cadiz's Motion for Summary Judgment ("Cadiz MSJ"), 18-6775 Docket No. 53-1.[4]  All of the parties filed oppositions to the other sides' motions for summary judgment.  *See* Centers' Opposition to Motion for Summary Judgment ("Centers Opp'n), 17-8587 Docket No. 71; NPCA's Opposition to Motion for Summary Judgment ("NPCA Opp'n"), 18-6775 Docket No. 59;[5] BLM's Memorandum in Opposition to Motion for Summary Judgment ("BLM Opp'n"), 18-6775 Docket No. 57; Cadiz's Opposition to Motion for Summary Judgment ("Cadiz Opp'n"), 18-6775 Docket No. 58.[6]  Oral arguments on the motions were heard on June

---

[3] The Court again notes again that the individual defendants were sued in their official capacities and that some of the individuals' identities have changed since the inception of this lawsuit.  To the extent the names of the individual defendants is important to this Court's ruling, the parties should clarify the issue for the Court.

[4] The BLM and Cadiz each wrote only one version of their respective briefs in favor of their motions and filed them on both dockets.

[5] As mandated by the Court, the Centers and NPCA each wrote only one version of their respective briefs in opposition to the Defendants' two motions for summary judgment

[6] Again, the BLM and Cadiz each wrote only one version of their respective briefs in opposition to the Plaintiffs two motions for summary judgment and filed them on both dockets.

20, 2019.

    B.  Factual Background[7]

       *1. The Proposed Pipeline*

    Cadiz is a resource development company that owns over 34,000 acres of private land in the Mojave Desert overlying groundwater basins ("Cadiz Property").  *See* BLM's Statement of Genuine Disputes of Material Fact in response to NPCA's Statement of Undisputed Facts ("NPCA SUF"), 18-6775 Docket No. 57, ¶ 1; BLM's Statement of Uncontroverted Facts and Conclusions of Law ("BLM SUF"), 18-6775 Docket No. 54-3, ¶ 1.[8]  Cadiz, in collaboration with the Santa Margarita Water District ("SMWD") and other water providers, developed the Cadiz Valley Water

---

[7] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiffs or Defendants.  The Court has reviewed said disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the uncontroverted evidence.  To the extent that the cited underlying "undisputed" facts have been disputed, the Court finds that the stated disputes: (1) fail to controvert the proffered "undisputed" facts, (2) dispute the facts on grounds not germane to the below statements, and/or (3) fail to cite evidence in support of the disputing party's position.  As such, the Court treats such facts as undisputed.  Any proffered facts not included in this tentative ruling were found to be: (1) improper opinions or conclusions rather than facts, (2) were unsupported by admissible evidence, (3) were deemed irrelevant to the Court's present analysis, or (4) some combination thereof.  To the extent the Court uses any facts in the Discussion section of this tentative ruling, and does not note that they are disputed, it has determined that they are undisputed.

    Cadiz and the BLM both object to Plaintiffs' filing of evidence outside of the administrative record for any purpose other than standing.  *See* BLM Evidentiary Objections to the Centers' evidence, 17-8587 Docket No. 72-3; Cadiz Evidentiary Objections to the Centers' evidence, 17-8587 Docket No. 73-2; BLM Evidentiary Objections to NPCA evidence, 18-6775 Docket No. 57-3; Evidentiary Objections to NPCA evidence, 18-6775 Docket No. 58-2.  The Court would rule as follows:

    Because the Defendants do not object to the consideration of the proffered declarations for the purposes of standing, the Court will admit the various declarations from the groups' members for that purpose.  Otherwise, because this is an administrative record case, the Court will only consider material outside of that record in four narrow circumstances:

        1) where the extra-record evidence is "necessary to determine whether the agency has considered all relevant factors and has explained its decision;" 2) where "the agency has relied on documents not in the record;" 3) where "supplementing the record is necessary to explain technical terms or complex subject matter;" or 4) where "plaintiffs make a showing of agency bad faith."

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600-01 (9th Cir. 2018) (quoting *Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996)).  Plaintiffs have not made the requisite showing that their proffered evidence falls within one of the four exceptions.  As such, the Court would not consider the extra-record evidence for any purpose other than standing.

    The Centers also request the Court take judicial notice of two news articles.  *See* Centers Request for Judicial Notice, 17-8587 Docket No. 67-5.  The Court is not inclined to take judicial notice of those documents because the Plaintiffs have not even argued that it falls within one of the four delineated circumstances above.  The Court would therefore sustain the evidentiary objections.

[8] NPCA only "partially disputes" three of BLM's purported undisputed facts. *See* Statement of Genuine Disputes of Material Facts in Response to BLM's SUF, 18-6775, Docket No. 59-1.  To the extent the Court relies on any of these partially disputed facts, the Court has reviewed the administrative record and used only facts that are truly undisputed.

Conservation, Recovery, and Storage Project ("Cadiz Project") to "convey for a 50-year span an annual average of 50,000 acre-feet (16.3 billion gallons) of water pumped from [an ancient] groundwater aquifer to the Colorado River Aqueduct . . . for a distance of approximately 43 miles." NPCA SUF ¶ 3.  In 2001, the Metropolitan Water District proposed a pipeline for the Cadiz Project that would cross BLM-managed lands outside of any railroad right-of-way.  *See id.* ¶ 4; BLM 2740.[9]  An Environmental Impact Statement / Environmental Impact Report was prepared and BLM granted the right of way for the pipeline.  *See* BLM 2740.  Regardless, the Metropolitan Water District rejected the terms and conditions and did not proceed with the project.  *Id.*

In 2005, Cadiz and several Southern California water districts resumed interest in the project.  *Id.*  In 2008, Cadiz entered into a Longitudinal Lease Agreement with ARZC to construct, operate, and maintain a subsurface water-conveyance pipeline and a power line between the Cadiz Property and the Colorado River Aqueduct along a 43-mile portion of the ARZC right-of-way.  *Id.* at 5015; NPCA SUF ¶ 12.  ARZC's predecessor obtained the right-of-way under the authority of the 1875 Act between 1905 and 1911.  NPCA ¶ 11.

In December 2011, Cadiz and ARZC amended the lease agreement to incorporate six design features related to ARZC's anticipated uses of the right-of-way.  *See* BLM 4675-76; *id.* at 2741.  These anticipated uses and design features include:

- Fire hydrants to suppress fires that could damage the railroad trestles and facilities.

- An access road to be constructed that would provide access in case of train derailment or for maintenance.

- Access to 10,000 gallons of water per day for vegetation control, washing rail cars, offices, and other contemplated improvements.

- Access to power at meters located along the railroad tracks and emergency access to power at any location.

- Future operations of a contemplated excursion train along the ARZC rails may require accommodations for passenger terminals and water service for the likely steam powered locomotives.

- Right to connect and deliver water at any future water production facilities within the ARZC right of way to the pipeline and facilities.

*Id.* at 4675-76, 4678.

    *2. The BLM's Interpretations of the 1875 Act and Treatment of the Cadiz Project*

---

[9] "BLM __" represents the bates stamps numbers on the documents included within the administrative record.

From 1989 to 2011, Interior's 1989 M-Opinion (M-36964) (the "1989 M-Opinion") expressed official Interior policy regarding rights-of-way under the 1875 Act. NPCA SUF ¶ 15. The 1989 M-Opinion stated, "[u]nder the 1875 Act, railroads were granted an 'easement.' The scope of this easement, unlike an ordinary common-law easement, is an interest tantamount to fee ownership, including the right to use and authorize others to use (where not inconsistent with railroad operations) the surface, subsurface, and airspace." *Id.* ¶ 16.

In and around August 2011, BLM contacted Cadiz, SMWD, and ARZC requesting information about the relationship between the proposed Cadiz Project and ARZC's railroad operations. *Id.* ¶ 20; BLM SUF ¶ 6; BLM 7882. In this correspondence, BLM notified the recipients that the Interior Solicitor at the time, Hilary Tompkins, was reviewing the 1989 M-Opinion. *See* BLM 7882. While the correspondence between the interested parties was taking place, Interior partially withdrew the 1989 M-Opinion by promulgating M-37025 in November 2011 ("2011 M-Opinion"). NPCA SUF ¶ 21. The 2011 M-Opinion concluded that: 1) the 1989 M-Opinion was not consistent with the 1875 Act, and 2) a railroad's authority to undertake or authorize activities within an 1875 Act right-of-way is "limited to those activities that derive from or further a railroad purpose, which allows a railroad to undertake, or authorize others to undertake, activities that have both railroad and commercial purposes, but does not permit a railroad to authorize activities that bear no relationship to the construction or operation of a railroad." BLM 8038. The 2011 M-Opinion also recognized that certain uses incidental to the operation of a railroad fall within the rights-of-way. *See id.* at 8045-47. Following the promulgation of the 2011 M-Opinion, BLM continued to request information from Cadiz, SMWD, and ARZC about the Cadiz Project and its relation to railroad operations. *See* BLM SUF ¶ 6. The interested parties responded to these requests, providing information about how the proposed design elements would affect railroad operations. *See id.* In one of these responses, ARZC explained that it "would utilize the 43-mile Cadiz pipeline and/or accompanying power lines to serve both railroad purposes and commercial purposes." BLM 2861. ARZC described how certain elements of the Cadiz Project would improve the safety of ARZC's operations by placing fire hydrants along the line, developing access roads, and providing power to the railroad. *Id.* The project would allot 10,000 gallons of water per day for railroad operations, and would also "include potential accommodations for passenger terminals and water service for steam powered locomotives." *Id.* The response further explained how the project would aid in fire suppression and the development of a steam-powered

tourist train.  *Id.* at 2861-2869.

In August 2014, the BLM issued an Instruction Memorandum (IM 2014-122 or the "2014 IM") on how to evaluate proposed and existing activities within 1875 Act railroad easements pursuant to the legal conclusions in the 2011 M-Opinion.  *See* BLM SUF ¶ 8.  This guidance established criteria that BLM would consider on a case-by-case basis when making an administrative determination as to whether proposed or existing activities derive from or further a railroad purpose.  *Id.*  The 2014 IM provided that the BLM must consider the following factors:

- The specific purpose of the 1875 Act, which was to give railroads the exclusive right to use and occupy the granted ROW[10] for railroad purposes;

- The concept that, even though railroad ROW grants are generally broadly construed, any doubts about the scope of such grant are still to be resolved in the Government's favor. As a practical matter, this means that a railroad ROW holder and/or the party arguing that a particular activity is within the scope of an 1875 Act ROW must provide sufficient evidence to overcome any doubts as to whether a particular activity is within the scope of the ROW;

- The relationship between the activity and the railroad – e.g., does the activity in question originate or issue from, help promote, and/or advance the railroad purposes; and

- Historical industry practice with respect to the activity in question – e.g., is the proposed activity one that has been used by railroads previously in furtherance of a railroad purpose.

BLM 2727.

Pursuant to the 2014 IM, the BLM California State Office sought additional information from Cadiz relating to the proposed relationship between elements of the Cadiz's proposed water conveyance pipeline along ARZC's railroad right-of-way and ARZC's railroad operations.  *Id.* ¶ 9.  After various interactions with BLM,[11] on January 9, 2015, Cadiz provided a letter with an executive summary and supporting documentation outlining how it thought elements of the Cadiz

---

[10] At times, the parties refer to "rights-of-way" as "ROWs."

[11] David Bernhardt, the current Secretary of the Interior, then at the law firm of Brownstein, Hyatt, Farber, Schreck LLP ("Brownstein"), represented Cadiz at various points during Cadiz's negotiations with BLM between January 2012 and January 2015.  *See* BLM's Genuine Statement of Material Fact in Response to Centers' Statement of Uncontroverted Facts and Conclusions of Law (Centers SUF), 17-8587 Docket No. 72-2, ¶ 18.  The BLM notes that Bernhardt filed a recusal memo agreeing not to participate in matters involving Cadiz.  *See* Bernhardt Recusal Memo, Docket No. 57-1.

Project would further ARZC's railroad operations. *See* BLM SUF ¶¶ 10-11; BLM 2476. Cadiz highlighted five potential railroad purposes that the pipeline project would further: (1) a new access road along the pipeline route; (2) remotely operated fire suppression systems at each of the 42 existing trestles; (3) inline power generation to provide lighting and railroad transloading; (4) fiber optic information transmission; and (5) the distribution of water for railroad operations that would include a steam powered locomotive, fire-suppression and other uses. *See* BLM SUF ¶ 11; BLM 2472.

On October 2, 2015, the BLM California Deputy State Director submitted to the BLM California State Director a 24-page final evaluation of the information provided by Cadiz with a conclusion/recommendation that Cadiz's proposed water conveyance pipeline does not derive from or further a railroad purpose (the "2015 Determination") and would therefore require a BLM right-of-way permit. *See* BLM SUF ¶ 12; BLM 2257-80. The BLM notified Cadiz of its decision and sent a 5-page summary of the 2015 Determination. BLM SUF ¶ 12; BLM 2243-49. Overall, the 2015 Determination noted that "primary purpose of the pipeline is to convey water for distribution to a separate and distant location for commercial distribution, and nearly 100 percent of the conveyed water would be solely devoted to this purpose. There is no relationship between the express purpose for the pipeline and the railroad's operation." BLM 2264. The 2015 Determination then identified the "main proposed project components . . . [as] a water conveyance pipeline including in-line turbines for power generation and other water uses, an access road for the pipeline, a water-based fire suppression system utilizing fiber optic [lines], a power distribution line and facilities it would support, and a tourist-based steam-powered excursion train with appurtenances." *Id.* at 2262. Reviewing each component, the 2015 Determination concluded that the water conveyance pipeline itself was not a railroad purpose because "[c]onveyance of water for public consumption . . . is not necessary for the construction or operation of a railroad, and the origin of the activity itself is a non-railroad purpose." BLM 2266. The 2015 Determination further stated that "[p]roduction of electricity via in-line turbines located in such a pipeline likewise is not within the scope of the ROW granted by the Act, as it remains unclear as presented how power-generation activity issues from railroad purposes." The 2015 Determination also noted that the daily allotment of 10,000 gallons for the railroad represented 0.02% of the water that would run through the pipeline, and that it did not review the "contemplated but not planned aspects of the Project," such as "washing railcars, controlling vegetation, serving its offices and other

7

improvement and future operations, such as a steam-powered excursion locomotive, new warehouses (if any), bulk transfer facilities or other railroad related facilities on the line." *Id.* at 2263, 2266.

As to the fire suppression system, the 2015 Determination recognized that, "[d]epending on the nature and location of the rail line, fire suppression may further a railroad purpose." *Id.* at 2268. However, the BLM noted:

> The use of water as a fire suppressant only on those trestles and bridges that cross over 43 miles of BLM land (on a rail line that extends for over 200 miles), and only where the pipeline would be located, suggests this component was added to draw some connection between the water conveyance pipeline and the railroad, especially given that there is no history of fires long this route.

*Id*. Regarding the fiber optic line, the 2015 Determination stated that it would not serve a railroad purpose "because the fiber optic line would be dedicated to the operation of a fire suppression system and communications for a water conveyance pipeline, neither of which serve a railroad purpose." *Id.* at 2270. Finally, the 2015 Determination observed that the "[u]se of water for fire suppression on creosote-treated timber is an uncommon industry practice, with dry sand being the preferred method, and thus the water-based hydrants and sprinklers, and fiber optic telemetry used to operate them, do not derive from or further a railroad purpose." *Id*.

Again, as to the access road, the BLM recognized that it "may further a railroad purpose because access to the rail line for maintenance, inspection and response to railroad emergencies further and derive from railroad purposes." *Id.* at 2272. But, because "the origin of the access road is to support the non-railroad purpose of water conveyance for public consumption unrelated to railroad activities," BLM determined that the road did not fall within the scope of ARZC's right-of-way. *Id.* at 2273. Similarly, the 2015 Determination stated that a power line and expanding transload facilities may further a railroad purpose, but that "the origin of the power for these activities is generated by the in-line turbines," which are not within the scope of the right-of-way. *Id.* at 2276. And, lastly, as to the proposed steam-powered excursion train the 2015 Determination concluded:

> A steam-based excursion train may derive from or further a railroad purpose. As presented, however, it remains unclear if it is a reasonably foreseeable activity or merely speculative. The excursion train's prospective use of a small portion of the pipeline's water does not convert the excursion train, the pipeline, or the water that runs through the pipeline into a legitimate railroad purpose. If

8

> the excursion train proposal by Cadiz, Inc. remains bound to and a component of the water conveyance pipeline, authorization from the BLM is required for operation of the excursion train. The responsibility is on the party presenting the activity to overcome uncertainty for the government, and doubts are to be resolved in the government's favor. Presentation of the excursion train with appurtenant facilities on its own merits can be reconsidered, separate and apart from the primary water conveyance purpose proposal.

*Id.* at 2280.

A few days after it received the 2015 Determination, Cadiz sent the BLM Director a letter arguing that the decision was contrary to law and must be rescinded. BLM SUF ¶ 13; NPCA SUF ¶ 60. Cadiz and the BLM corresponded about the 2015 Determination in the months that followed. *See* BLM SUF 13; NPCA SUF ¶¶ 61, 64-65.

In December 2016, President-elect Trump ranked the Cadiz Project as number 15 on a list of "Emergency & National Security Projects." Cadiz's Response to Centers' Statement of Uncontroverted Facts ("Centers SUF"), 17-8587 Docket No. 73-1, ¶ 23. On February 1, 2017, Acting Deputy Secretary of the Interior James Cason held a video call with lobbyist Luke Johnson and lawyer Larry Jensen, both of Brownstein, which represented (and represents) Cadiz. *Id.* ¶ 24; NPCA SUF ¶ 71. Thereafter, the Interior political staff held meetings with BLM, Interior, and Solicitor's Office staff and received briefing materials regarding the Cadiz Project, and more generally, the 2014 IM and Interior's interpretation of the 1875 Act. BLM SUF ¶ 14. In an email, the Acting Chief of Staff for the BLM noted that the Cadiz Project was "controversial, with significant Congressional interest on both sides." BLM 2104. A March 13, 2017 "task matrix" sent to Acting Deputy Secretary James Cason and titled "Deputy Secretary Assignments Follow up List," shows that Cason directed interior officials to "get rid of the Hillary [sic] opinion, to leave the matter up to the railroad right of ways." NPCA SUF ¶ 88; BLM 1996. The task matrix also states that Cason directed then-Special Assistant to the Secretary, Downey Magallanes, to "take the [2011] 'M' Opinion, look at the facts, and write an analysis that says the facts suggesting railroad benefits were ignored." NPCA ¶ 89. Additionally, the task matrix shows that Cason asked Kathleen Benedetto "to revise the IM . . . [s]ooner rather than later." NPCA ¶ 90.

On March 29, 2017, BLM's Acting Assistant Director for Energy, Minerals, and Realty Management issued a new IM ("2017 IM") rescinding the 2014 IM (and an earlier 2012 IM describing the 2011 M-Opinion). BLM SUF ¶ 16. The 2017 IM directed that "[a]ll issues related to addressing activities within railroad rights-of-way granted pursuant to the [1875 Act] across

[BLM]-managed lands are to be directed to the BLM Washington Office, Energy, Minerals and Realty Management (WO-300) directorate."  BLM 971-72.  In response to the 2017 IM, Cadiz sent a letter to the BLM requesting that the agency confirm that the 2015 Determination was no longer in effect, and that the Cadiz pipeline project was within the scope of the ARZC right-of-way.  BLM SUF ¶ 17.  Apparently, BLM did not reply.  *See id.* ¶¶ 20, 22.

On June 30, 2017, Daniel Jorjani, Principal Deputy Solicitor, issued a memorandum that identified several post-2011 court decisions as potentially supporting the need to review the 2011 M-Opinion.  BLM 785.  Then, on September 1, 2017, Jorjani issued Solicitor's Opinion M-37048 ("2017 M-Opinion").  BLM SUF ¶ 21.  The 2017 M-Opinion withdrew the 2011 M-Opinion and "conclude[d] that the rights-of-way granted to railroad companies under the 1875 Act allow railroad companies to lease portions of their easements to third parties without permit or grant from [the BLM], provided that such leases are limited to the surface, broadly defined, of the easement *and do not interfere with the continued use of the easement as a railroad*."  BLM 75-76 (emphasis added).  As an alternative position, the 2017 M-Opinion stated that even if the scope of a railroad's right-of-way is limited to "railroad purposes," those purposes should be interpreted broadly in accordance with the incidental use doctrine.  *See Id.* at 22.

Finally, on October 13, 2017, the Acting BLM Director sent Cadiz, SMWD, and ARZC letters (the "2017 Determination") responding to their previous requests by: (1) expressly superseding the 2015 Determination because it no longer represented BLM's view of the applicable law and facts, and (2) concluding Cadiz's proposed activities were within the scope of rights granted to ARZC under the 1875 Act because the "Cadiz Project would not interfere with the continued use of the easement for railroad operations, nor would the proposed activities extend beyond the surface of the easement, broadly defined."  *See Id.* at 4-6.  Citing the incidental use doctrine, the BLM "additionally and alternatively conclude[d] that the activities proposed in the Cadiz Project further[ed] a railroad purpose, even if they do not originate or derive from that purpose."  *Id.* at 5.  Specifically, the BLM concluded that the following components of the plan would further a railroad purpose:

> 1. Water pumped through the Cadiz pipeline will enable the creation and operation of a new fire suppression system to prevent and minimize damage to railroad assets and disruption of railroad operations.  Cadiz proposes to construct and provide water for a fire suppression system to protect against fire for the 13 steel and 29 wooden railroad bridges that utilize creosote-treated timber trestles

and ties. The components of the fire suppression system would consist of automatic sprinklers and fire hydrants. The system would require the construction of fiber optic lines used for telemetry, for pipeline communications by Cadiz, and for emergency communications by ARZC.

2. Water pumped through the Cadiz pipeline will generate power that will be used in railroad operations. Cadiz also proposes to install inline turbines within the water conveyance pipeline for the purpose of generating power, in part for ARZC to use for key railroad operations such as expanding and providing power for new railroad transloading facilities, signal systems, and power switches for potential increases in railroad activity.

3. The project will provide transmission lines to bring electrical power that enables ARZC to install climate controlled storage containers, provide around the clock maintenance, and improve railroad security. The Cadiz Project includes the installation of power lines to support necessary power distribution (including power generated by the inline turbines) for the water conveyance pipeline. These power lines would in turn support ARZC's installation of facilities for heating and refrigeration of containers, lighting for more efficient night-time operations, and surveillance cameras to help prevent vandalism at an existing side-track, as well as lightening at additional locations.

4. Cadiz proposes to provide ARZC with access to 10,000 gallons of water a day pumped through the pipeline for their future purposes, including, but not limited to, use at a rail car wash site, vegetation control, use in offices, or other potential improvements.

5. Pipeline operation and maintenance will require the construction of an access road that will facilitate smoother railroad operations. Cadiz proposes to construct a 20-foot access road along ARZC's ROW to install, construct, operate, maintain, repair, renew and remove the pipeline and related facilities. The access road will be available to ARZC and provide ARZC with easier access to railroad facilities and assets to assist in crew changes, maintenance and inspection of the railroad, and emergency responses.

6. Water piped through Cadiz pipelines will enable the operation of a steam-based exclusion train on the ARZC rail line. Cadiz also proposes to operate a steam-based excursion train for tourists that utilizes water from the conveyance pipeline. Operation of such a tourist train would necessarily depend on the water obtained from the water pipeline.

*Id.* at 5-6.

C. Statutory Scheme

The 1875 Act grants:

> The right of way through the public lands of the United . . . to any railroad company . . . to the extent of one hundred feet on each side of the central line of said road; also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

43 U.S.C. § 934.  If a railroad company obtains an approval of a right of way under the 1875 Act, "all such lands over which such right of way shall pass shall be disposed of subject to such right of way." *Id.* § 937.

"The 1875 Act remained in effect until 1976, when its provisions governing the issuance of *new* rights of way were repealed by the [FLPMA]." *Brandt Revocable Trust v. United States*, 572 U.S. 93, 97 (2014) (emphasis added).  Under the FLPMA, BLM has the responsibility of managing public lands.  *See* 43 U.S.C. § 1701.  The "FLPMA replaced a 'tangled array of laws granting rights-of-way across public lands,' with a single method for establishing a right-of-way over public lands." *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1104 (9th Cir. 2006) (quoting *United States v. Jenks*, 22 F.3d 1513, 1515 (10th Cir. 1994)).  However, the FLPMA did not "terminat[e] any right-of-way or right-of-use heretofore issued, granted, or permitted." 43 U.S.C. § 1769.

Under NEPA, federal agencies must prepare a detailed environmental impact statement ("EIS") – or at least an Environmental Assessment "EA" to determine whether an EIS is needed – for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1508.18.

## II.   Legal Standard

### A.  Summary Judgment Standard

Courts commonly decide cases subject to the APA at the summary judgment stage because they "are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  However, even in the context of an administrative record review, the Ninth Circuit has indicated that "[s]ummary judgment is appropriate when the pleadings and record demonstrate that 'there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law.' "  *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014).[12]  When parties file cross-motions for summary judgment, the Court must consider the evidence submitted in support of both motions before ruling on either motion.  *See Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

    B.  APA Standard

A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision."  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).  This deferential standard does not allow a court to overturn an agency action simply because the court disagrees with the action.  *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  Agency actions, however, that are not "based on a permissible construction of [a] statute" may be set aside as a violation of the APA.  *See Auer v. Robbins*, 519 U.S. 452, 457 (1997).

**III.  Discussion**

    A.  Reviewability of the 2017 M-Opinion

       *1. Standing*

---

[12] In the same context, the Ninth Circuit has also stated the traditional standard that "[w]hen reviewing an order granting summary judgment, '[w]e must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.'"  *Building Indus. Ass'n of the Bay Area v. U.S. Dep't of Commerce*, 792 F.3d 1027, 1032 (9th Cir. 2015); *see also, e.g., Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1086 (9th Cir. 2004).  Considering the Supreme Court's discussion in *Florida Power & Light*, this Court is not aware of the Ninth Circuit explaining how the principles of viewing the evidence in the light most favorable to the nonmoving party and determining whether there are any issues of material fact would be employed in the summary judgment-setting of an APA administrative record review case (or at least as to the merits of the claims raised in such cases).  *See, e.g., Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) ("Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record."); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of this matter does not require fact finding on behalf of this court.  Rather, the court's review is limited to the administrative record, to which the plaintiff and the Defendants have stipulated to [*sic*].  Because this case does not present any genuine issues of material fact, summary judgment is appropriate.") (omitting internal citations).  *But see Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir. 1985) ("[W]e need to determine whether appellant raised a genuine issue of material fact as to whether the Service acted arbitrarily and capriciously in issuing the Permit under the [Endangered Species Act].").

NPCA challenges the 2017 M-Opinion itself as a violation of the APA, and asks the Court to declare it unlawful and vacate it. *See* NPCA MSJ 10; *see also* Centers MSJ (challenging only the 2017 Determination). Contesting the reviewability of the 2017 M-Opinion, the BLM asserts that: 1) NPCA lacks standing for a facial challenge to the legal opinion, and 2) that the 2017 M-Opinion is not a final agency action. *See* BLM MSJ at 5-8; BLM Opp'n at 1-3.

As to standing,[13] the BLM argues that NPCA may not bring its facial challenge to the 2017 M-Opinion because "it has not alleged, let alone demonstrated, harm from any project other than the Cadiz Pipeline." BLM MSJ at 5. The BLM asserts that NPCA's claimed interest – that the 2017 M-Opinion will affect railroads and lessees (beyond those involved in the Cadiz Project) – is speculative, and that NPCA fails to identify how other projects would harm its interests. *See* BLMS Opp'n at 2 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). NPCA responds that it need only show that one application of the 2017 M-Opinion harms the group's interests in order to challenge the opinion on its face. *See* NPCA Opp'n at 3 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 495-496 (2009)).

In *Summers*, a group of environmental organizations, collectively referred to as "Earth Island," sought "to prevent the United States Forest Service from enforcing regulations that exempt small fire-rehabilitation and timber-salvage projects from the notice, comment, and appeal process used by the Forest Service for more significant land management decisions." *Summers*, 555 U.S. at 490. Specifically, the regulation "provided that fire-rehabilitation activities on areas of less than 4,200 acres, and salvage-timber sales of 250 acres or less, did not cause a significant environmental impact and thus would be categorically exempt from the requirement to file an EIS or EA." *Id.* at 491. After a fire burned part of Sequoia National Forest, the Forest Service "approv[ed] the Burnt Ridge Project, a salvage sale of timber on 238 acres damaged by that fire," and did not provide a notice, comment, or appeal process. *Id.* Earth Island challenged the regulations' application to the Burnt Ridge Project, eventually securing a preliminary injunction. *Id.* However, "soon thereafter, the parties settled their dispute over the Burnt Ridge Project." *Id.*

The Supreme Court took up "the question whether Earth Island could challenge the

---

[13] The BLM does not challenge the Plaintiffs' standing to contest the 2017 Determination. *See generally* BLM MSJ at 5-6; *id.* at 6 ("Thus, aside from the specific challenge to BLM's [2017] Determination regarding the Cadiz Pipeline, NPCA lacks standing to bring its separate facial challenge to the M-Opinion."). The Court previously ruled that the Centers had sufficiently pleaded standing. *See* Final Ruling on Defendants' Motion to Dismiss, 17-8587 Docket No. 31, at 8-11. The Court is satisfied that both Plaintiffs have standing to challenge the 2017 Determination. *See* NPCA MSJ at 6 (citing its members declarations); Centers MSJ at 12-13 (same).

regulations at issue in the Burnt Ridge Project." *Id.* at 492.  The Supreme Court recognized that at least one of Earth Island's members had standing to challenge the regulations with respect to the Burnt Ridge Project prior to settlement.  *See id.* at 494.  However, after settlement, that member no longer had standing to challenge the regulation in the abstract.  *Id.*  The Court further noted that Earth Island had "identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of [its] members." *Id.* at 495.  Therefore, the Supreme Court held that the group lacked standing to challenge the regulations.

In the instant matter, the Court would find that NPCA has standing to challenge the 2017 M-Opinion.  The relationship between the 2017 M-Opinion and the Cadiz Project is analogous to the relationship between the regulations at issue in *Summers* and the Burnt Ridge Project pre-settlement.  In both cases, the application of the opinion/regulation would threaten imminent and concrete harm to the plaintiffs.  Here, the 2017 M-Opinion dictated the BLM's 2017 Determination that it need not authorize the Cadiz pipeline project, thus making it easier for Cadiz to complete the project that would harm NPCA's interest in enjoyment of the affected-area.  NPCA does not need to demonstrate anything more to establish standing to challenge the 2017 M-Opinion.

The BLM also cited *Summers* in its papers, for the general principle that NPCA must show that the 2017 M-Opinion threatens to cause its members an injury in fact that is concrete and particularized.  *See* BLM MSJ at 5.  But, the BLM's reliance on *Summers* is misguided.  As described above, the injury asserted here is almost identical to the injury related to the Burning Ridge Project that the Government conceded established standing.  *Summers*, 555 U.S. at 494.  It bears mentioning though that the Court would agree with the Government's argument if the parties were to settle the Cadiz Project dispute.  *See id.* at 495.  NPCA may challenge the 2017 M-Opinion, but if the Cadiz Project issue is removed from the case for any reason, NPCA would not have standing in the abstract for its facial challenge to the legal opinion.

### 2. Finality of 2017 M-Opinion

Next, the BLM asserts that the 2017 M-Opinion itself is exempt from review because it is not a final agency action under the APA.[14]  *See* BLM MSJ at 6-8.  Typically, an agency's action is final if two conditions are satisfied.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  "First, the

---

[14] Neither party addresses whether the 2017 M-Opinion is an agency "action."  Instead, the parties argue the finality of the action.  Further, neither party discusses whether the BLM or Interior intends to issue formal regulations adopting the legal conclusions of the 2017 M-Opinion.

action must mark the consummation of the agency's decisionmaking process − it must not be of a merely tentative or interlocutory nature." *Id.* at 177-78 (citation and internal quotation marks omitted). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178. In the Ninth Circuit, "courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014). A court must therefore focus on both the "practical and legal effects of the agency action," and define the finality requirement "in a pragmatic and flexible manner." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citations omitted).

The BLM argues that the 2017 M-Opinion is not a final agency action because it does not establish any legal rights or obligations and does not have the force and effect of law. *See* BLM MSJ at 6-8. As best as the Court can tell, the BLM is relying on the second *Bennett* prong, rather than attacking whether the 2017 M-Opinion was the culmination of the agency's decisionmaking process.

First, the BLM directs the Court to various cases that hold that the issuance of a legal opinion is not a final agency action. *See id.* at 6-7. For example, in *Navajo Nation v. United States Department of Interior*, 819 F.3d 1084, 1092 (9th Cir. 2016), the court concluded that the agency's final action was not the issuance of legal guidance, but rather the decision implementing that guidance. The plaintiffs in that case sought the immediate return of human remains and associated funerary objects but Interior argued that it was required to complete an inventory process pursuant to Native American Graves Protection and Repatriation Act ("NAGPRA"). *Id.* at 1085-86. Interior's solicitor concluded that the NAGPRA inventory requirements applied to the remains at issue, and National Park Service officials informed the plaintiffs that the items would not be returned prior to the completion of the inventory. *Id.* at 1091-92. The Ninth Circuit concluded that it was "the agency's decision to apply NAGPRA to these remains and objects that constituted a final agency action. The court, however, clarified that the final agency action was not the National Parks Service's "informal request to its lawyers for legal advice regarding NAGPRA's applicability." *Id.* at 1092.

To a certain extent, *Navajo Nation* is not exactly on point because it does not appear that the plaintiffs directly challenged the underlying legal guidance from Interior's solicitor. Rather, they challenged the agency's decision to apply that opinion to the specific remains at issue.

16

Further, the underlying legal opinion in *Navajo Nation* was not a formal written opinion. *See id.* at 1091. Instead, the opinion was "informally given," and it was the agency's decision to apply that legal opinion that constituted a final agency action. Still, *Navajo Nation* supports the BLM's argument that the decision to *apply* a legal opinion is the final agency action. As is the case here, the National Park Service's letter informing the plaintiffs that NAGPRA applied to the remains referenced the underlying legal opinion. Nonetheless, the court concluded that the agency action in question was the determination, rather than the underlying legal opinion.

NPCA avers that the 2017 M-Opinion is distinct from such tentative, interlocutory, or informal legal opinions because it was immediately binding upon the BLM. *See* NPCA MSJ at 8. The Court tends to agree, but doubts whether the distinction matters for reasons explained below. *See Air Cal. v. U.S. Dep't of Transp.*, 654 F.2d 616, 620-21 (9th Cir. 1981) (a letter from FAA's Chief Counsel concurring in the result of a report and offering some legal advice was not final agency action because it was "neither a definitive statement of the agency's position nor a document with the status of law."); *Sabella v. United States*, 863 F. Supp. 1, 5 (D.D.C. 1994) (General Counsel of NOAA stating that "it is my opinion that U.S. citizens may not lawfully engage in any foreign tuna fishing operations after February 28, 1994 that would involve the intentional encirclement of marine mammals unless they are engaged in scientific research . . . *In the near future the National Marine Fisheries Service will issue rules to inform the public of this interpretation*.") (emphasis added); *Glamis Imperial Corp. v. Babbitt*, No. 3:00-cv-1934-W-POR, at *2-4 (S.D. Cal. Oct. 31, 2000) (ECF No. 30) (opinion letter from Secretary of Interior about a specific project does not make a decision on the project and "explicitly concedes that ultimate responsibility for its approval or denial rests with BLM."). However, as provided in Interior's Manual, M-Opinions are "final legal interpretations" and are "binding, when signed, on all other Departmental offices and officials and which may be overruled or modified only by the Solicitor, the Deputy Secretary, or the Secretary." *See* 209 Interior Department Manual 3.2(A)(11).

Still, even if the 2017 M-Opinion represents the culmination and final legal interpretation of the scope of 1875 Act rights-of-way, there is a question as to *Bennett*'s second prong. NPCA argues that the 2017 M-Opinion is more like an "interpretive rule" that fixes the "legal relationship between Interior (through BLM), prospective third-party users of an 1875 Act right-of-way, and the holders of that right-of-way." *See* NPCA Opp'n at 8. The BLM contends that the 2017-Opinion does not determine the rights of any third parties, but instead "merely articulates the legal

background for the BLM to evaluate and make internal determinations as to whether certain uses fall with the 1875 Act." BLM Opp'n at 8. Or, in other words, the BLM contends that the 2017 M-Opinion is an "internal legal opinion and does not legally bind third parties." *Id.*

While the Court recognizes that it must "consider whether the action has the status of law or comparable legal force, and whether immediate compliance with its terms is expected," the Court is skeptical that a legal opinion like the 2017 M-Opinion actually sets the rights of any third-parties. Rather, in the Court's mind, the 2017 M-Opinion provides abstract guidance to the agency that only affects parties' rights when the opinion is *applied* to a particular situation. Hypothetically, if there were no planned uses of an 1875 Act right-of-way, the 2017 M-Opinion would have no effect on a third-party. As such, the 2017 M-Opinion would only have an "indirect effect upon the complaining party" until its conclusion was applied to a particular situation. *See Air Calif.*, 654 F.2d 616; *see also McMaster v. United States*, 731 F.3d 881, 898 (9th Cir. 2013) (examining the BLM's reservation of the surface estate for the United States in a mining patent, rather than looking to the M-Opinion that dictated the result).

Further, the interpretive rule and jurisdictional determination cases that NPCA cites are easily distinguishable – and even aid the BLM's argument – in that the agency actions involved all related to specific projects, rather than the agency's abstract interpretation of a statute. For example, in *Bennett*, the plaintiffs challenged a "Biological Opinion" made pursuant to the Endangered Species Act. *See* 520 U.S. at 159. The Biological Opinion concluded that "'long-term operation of the Klamath [Irrigation] Project was likely to jeopardize the continued existence of the Lost River and shortnose suckers [species of fish]." *Id.* (internal quotation marks omitted). The conclusion that the project would jeopardize the continued existence of the species meant that the agency had to "outline any 'reasonable and prudent' alternatives.'" *Id.* at 158 (quoting 16 U.S.C. § 1536(b)(3)(A)). The agency believed that maintaining the water levels on certain lakes and reservoirs would avoid jeopardy to the species. *Id.* at 159. In addressing the finality of the Biological Opinion, the Supreme Court concluded that it was final because it "alter[ed] the legal regime to which the action agency is subject." *Id.* at 178. Specifically, "the Biological Opinion and accompanying Incidental Take Statement alter[ed] the legal regime to which the [agency] is subject, [by] authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." *Id.* In other words, obligations as to a particular project flowed from the issuance of the Biological Opinion. *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d

977, 986-87 (9th Cir. 2006) (holding that Forest Service's issuance of annual operating instructions ("AOIs") to permittees who graze livestock on national forest land constitutes final agency because "an AOI is a discrete, site-specific action representing the Forest Service's last word from which binding obligations flow."); *see also Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593-94 (9th Cir. 2008) (holding that a "jurisdictional determination" pursuant to the Clean Water Act that a particular property contained wetlands was not a final agency action in part because the determination "does not itself command [plaintiff] to do or forbear from anything as a bare statement of the agency's opinion."); *but see U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (holding that a Clean Water Act jurisdictional determination is a final agency action).[15]

Lastly, the Court rejects NPCA's argument that the 2017 M-Opinion is final because it is the group's last opportunity to challenge potential uses of the 1875 Act rights-of-way as wrong. As evidenced by the Centers' lawsuit, it is possible for plaintiffs to challenge the standard applied in the 2017 Determination absent a facial challenge to the 2017 M-Opinion. The Court will still need to determine whether the standard set forth in the 2017 M-Opinion is correct because the 2017 Determination relied on it. Further, even if the Court were to uphold the 2017 Determination solely based on the alternative argument that the Cadiz pipeline served railroad purposes consistent with the incidental use doctrine, that conclusion would still cast significant doubt on the "not interfere with" standard laid out in the 2017 M-Opinion, such that it would essentially be dead letter.[16] As such, whether the 2017 M-Opinion is a final agency action may be much ado about

---

[15] In the end, NPCA has not directed the Court to any case in which a party challenged an agency's abstract legal interpretation of a statute and a court held that legal interpretation to be a final agency action absent an application to a particular project. However, in *Hawkes Co.*, the Supreme Court relied on *Frozen Food Express v. United States*, 351 U.S. 40 (1956), which held that "an order specifying which commodities the Interstate Commerce Commission believed were exempt by statute from regulation, and which it believed were not," was a final agency action even though "the order had no authority except to give notice of how the Commission interpreted the relevant statute, and would have effect only if and when a particular action was brought against a particular carrier." *Hawkes Co.*, 136 S. Ct. at 1815.

The BLM directs the Court to *Hawkes Co.*, but neither party discusses *Frozen Food Express*. The Court thinks that *Frozen Food Express* may be distinguishable from the situation here in that the order in that case detailed specific commodities, whereas the 2017 M-Opinion sets out a more generalized standard. However, the parties should be prepared to address this point.

[16] The Court also notes that there may be standing issues in challenging the 2017 M-Opinion in the absence of its application to any particular project, as discussed above. *See Earth Island*, 555 U.S. at 495. This supports the conclusion that the 2017 M-Opinion is not subject to a facial challenge as a final agency action.

nothing.[17]   Nonetheless, NPCA brought the claim and the Court would be inclined to reject it at this point, but is open to more argument on the point.

       C.  Legality of the 2017 Determination – "Not Interfere" Standard

As described above, the 2017 Determination really presents two separate decisions that Plaintiffs challenge.  First, the 2017 Determination concluded "that the Cadiz Project would not interfere with the continued use of the easement for railroad operations, nor would the proposed activities extend beyond the surface of the easement, broadly defined."  BLM 5.  Therefore, the pipeline project did not require authorization by BLM.  *See id.* at 4.  Second, the 2017 Determination put forward an alternative basis for its conclusion that the project did not need BLM approval.  *Id.* at 5.  Namely, that "the Cadiz Project would further a railroad purpose consistent with the historical understanding of the incidental use doctrine."  *Id.*

The Court will address the two decisions separately because they raise different legal issues and elicit different arguments from the parties.  As to the first decision, both sets of Plaintiffs argue that the 2017 Determination is contrary to the 1875 Act because the standard set forth in the 2017 M-Opinion (and applied in the 2017 Determination) – that a railroad may lease its right-of-way so long as the lease does not interfere with the continued use of the easement for railroad operations[18] – is contrary to the 1875 Act.  *See Centers MSJ* at 13; NPCA MSJ at 10, 15.  NPCA also argues that the 2017 Determination is arbitrary and capricious because it is the product of pretextual and post-hac rationalizations.  As to the 2017 Determination's alternative decision – that that the Cadiz pipeline project would further a railroad purpose – Plaintiffs argue that the decision is arbitrary and capricious because the BLM did not sufficiently explain why it had changed its conclusion from the 2015 Determination.  Centers MSJ at 21; NPCA MSJ at 21.

     *1. Deference to 2017 M-Opinion*

To determine whether the 2017 Determination's first decision was contrary to law, the Court must consider the standard governing the scope of rights-of-way under the 1875 Act.  However, because of the parties competing understandings of the 1875 Act, the Court must first

---

[17] In the end, NPCA has not directed the Court to any case in which a party challenged an agency's abstract legal interpretation of a statute and a court held that legal interpretation to be a final agency action absent an application to a particular project

[18] Neither Plaintiff challenges the 2017 Determination's conclusion that leases of rights-of-way must be "limited to the surface, broadly defined, of the easement."  As such, the Court will focus on whether the leases must further a railroad purpose or simply not interfere with the continued use of the easement for railroad purposes.

analyze whether the BLM's interpretation of the 1875 Act as set forth in the 2017 M-Opinion is entitled to deference and, if so, how much.  *See McMaster*, 731 F.3d at 889.

"Under *Chevron,* [courts] conduct a two-step inquiry to determine whether an agency interpretation warrants deference.  At step one, [courts] ask 'whether Congress has directly spoken to the precise question at issue.' " *Id.* (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984)).  Here, there is no question that the 1875 Act "is silent or ambiguous" about the scope of the rights-of-way granted to the railroads.  *See Chevron*, 467 U.S. at 843.  The 1875 Act simply grants "[t]he right of way through the public lands of the United . . . to any railroad company," subject to a few limitations that do not directly speak to which uses a railroad may lease its right-of-way.  43 U.S.C. § 934.  Based on the Court's plain reading of the 1875 Act, and the lack of any argument from the parties on the point, the Court would conclude that the 1875 Act is ambiguous under *Chevron* step one.  Therefore, the Court "must determine how much weight to afford the agency interpretation before moving to step two." *McMaster*, 731 F.3d at 891.

The Court would conclude – as the BLM seems to accept – that *McMaster* provides the answer here.  *See* BLM MSJ at 9.  In *McMaster*, the Ninth Circuit reviewed an M-Opinion from the Solicitor of Interior and concluded that it did not warrant *Chevron* deference.  *See McMaster*, 731 F.3d at 891-92.  The court reasoned that the M-Opinion "was not promulgated in the exercise of [Interior's] authority to issue regulations regarding public lands," and that "[t]he Supreme Court has stated that [i]nterpretations such as those in opinion letters which lack the force of law do not warrant *Chevron*-style deference."  *Id.* at 891 (internal quotation marks and citations omitted). *McMaster* further noted that the Ninth Circuit had concluded that "Solicitor's opinions . . . cannot properly be viewed as an administrative agency interpretation of statute that has the force of law." *Id.* (quoting *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,* 353 F.3d 1051, 1068 n. 16 (9th Cir. 2003)).  As such, the Court would find that the 2017 M-Opinion is not entitled to *Chevron* deference.

Nonetheless, *McMaster* went on to conclude that the M-Opinion was "entitled to respect under *Skidmore* [*v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)]." *McMaster*, 731 F.3d at 892.  "Under *Skidmore*, '[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and [any other] factors which give it power

21

to persuade.' " *Id.* (quoting *Skidmore*, 323 U.S. at 140) (alterations in original). *McMaster* determined that:

> [B]ecause the Solicitor's Opinion is consistent with the text of the statute, purpose, and our prior precedent, and because it adequately discussed and explained legislative history that could be perceived contrary to its interpretation, we find the Solicitor's Opinion to be persuasive.  We therefore conclude that the Solicitor Opinion's interpretation of "valid existing rights" is entitled to *Skidmore* deference.

*McMaster*, 731 F.3d at 896.

The Court notes that it is a bit circular that in order to determine whether to afford any deference to the 2017 M-Opinion and its application in the 2017 Determination, the Court must basically answer the main question in this case:  what is the scope of a right-of-way under the 1875 Act?  Thus, the Court will address the persuasiveness of the 2017 M-Opinion below in discussing the interpretation of the 1875 Act.  For the reasons described below, the Court would not afford the 2017 M-Opinion much deference.  In short, though it is formal and somewhat expansive, it is not a persuasive analysis of the law at issue and seemingly cherry-picks portions of different sources to craft a case for a directed/desired result.

### 2. The 1875 Act's Text and Purpose

Since its passage, the Supreme Court has several times explained the background, context, and purpose of the 1875 Act.  *See, e.g.*, *Brandt*, 572 U.S. at 96-98; *Great Northern R.R. Co. v. United States*, 315 U.S. 262, 272-77 (1942).  This Court will not duplicate the efforts of those courts, but will provide the most salient points of historical context to aid the discussion.

"In the early 1860s, Congress began granting to railroad companies rights of way through the public domain, accompanied by outright grants of land along those rights of way." *Brandt*, 572 U.S. at 96-97 (citing P. Gates, History of Public Land Law Development 362–368 (1968)). "Railroads could then either develop their lots or sell them, to finance construction of rail lines and encourage the settlement of future customers. Indeed, railroads became the largest secondary dispenser of public lands, after the States." *Brandt*, 572 U.S at 97. "This policy incurred great public disfavor," leading to a March 11, 1872 House of Representatives resolution stating,

> Resolved, that in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual

settlers, and for educational purposes, as may be provided by law.

*Great Northern*, 315 U.S. at 273-74 (quoting Cong. Globe, 42d Cong., 2d Sess., 1585 (1872)). Between 1871, when "Congress enacted the last checkerboard land-grant statute for railroads," and 1875, "Congress passed at least 15 special acts . . . granting to designated railroads 'the right of way' through public lands, without any accompanying land subsidy." *Brandt*, 572 U.S. at 97-98 (citing *Great Northern*, 315 U.S. at 274). "The burden of this special legislation moved Congress to adopt the [1875 Act]." *Great Northern*, 315 U.S. at 275. The 1875 Act "was significantly different from the Act of 1862 and its companions. It granted the railroads neither alternate sections of public land nor direct financial subsidy." *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 127-28 (1957) (Frankfurter, J., dissenting).

Based on this historical context, the Supreme Court has stated that the 1875 Act "was designed to permit the construction of railroads through the public lands and thus enhance their value and hasten their settlement." *Great Northern*, 315 U.S. at 272; *see also United States v. Denver & Rio Grande Ry. Co.*, 150 U.S. 1, 8 (1893) ("The general nature and purpose of the act of 1875 were manifestly to promote the building of railroads through the immense public domain remaining unsettled and undeveloped at the time of its passage. It was not a mere bounty for the benefit of the railroads that might accept its provisions, but was legislation intended to promote the interests of the government in opening to settlement and in enhancing the value of those public lands through or near which such railroads might be constructed."). As such, the Court will consider the foregoing purposes in its consideration of the scope of the 1875 Act rights-of-way.

The first main issue on the merits of this case is whether the 1875 Act rights-of-way are limited to railroad purposes, or whether a railroad may lease its right-of-way so long as the intended use does not interfere with the operation of the railroad. The BLM first argues that the text of the 1875 Act does not limit the scope of the rights-of-way solely to railroad purposes. *See* BLM MSJ at 10. The applicable statutory provision simply grants "the right of way through the public lands of the United States . . . to the extent of one hundred feet on each side of the central line of said road" to eligible railroads. *See* 43 U.S.C. § 934. Further, the BLM argues that the 1875 Act grants two specific rights to railroads that are limited to particular railroad purposes, and that based on the statutory interpretation doctrine of "*expressio unius est exclusion alterius* (the expression of one is to the exclusion of others), the inclusion of express limitations on the latter two granted rights implies that the first right is not limited to particular purposes." BLM MSJ at

10.  The two additional granted rights are: (1) "the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad" and (2) the right to use "ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road." *See* 43 U.S.C. § 934.

In addition, the BLM argues that the purpose of the 1875 Act supports a broad reading of the right-of-way grant.  BLM MSJ at 11.  The BLM continues, "[g]iven the broad public purposes of the 1875 Act of encouraging westward expansion and economic development along rail lines, courts should liberally construe the statute to allow uses that serve those purposes, as long as they do not interfere with railroad operations."  *Id.*

Plaintiffs counter that *expressio unius est exclusion alterius* is inapplicable or is subordinate to more substantive considerations.  *See* NPCA Opp'n at 12-13; Centers Opp'n at 5-7.  Plaintiffs also note that the BLM somewhat mischaracterizes how courts are to interpret the 1875 Act, or public land grants in general.  *See* NPCA Opp'n at 12; Centers Opp'n at 6-7.  What the BLM fails to mention regarding how courts should read the 1875 Act is that the legislation is "subject to the general rule of construction that any ambiguity in a grant is to be resolved favorably to a sovereign grantor – 'nothing passes but what is conveyed in clear and explicit language.' " *Great Northern*, 315 U.S. at 272 (quoting *Caldwell v. United States*, 250 U.S. 14, 20, 21 (1919)).[19] Or, as the Supreme Court in *Brandt* remarked in explaining why the dissent cited the principle from *Great Northern*, and the Government did not:

> The dissent invokes the principle that "any ambiguity in land grants 'is to be resolved favorably to a sovereign grantor,' " *post,* at 1269 (quoting *Great Northern R. Co. v. United States,* 315 U.S. 262, 272, 62 S.Ct. 529, 86 L.Ed. 836 (1942)), but the Solicitor General does

---

[19] The 2017 M-Opinion mentions the presumption of sovereign reservation, only to point out that a district court in *In re SFPP Right-of-Way Claims*, No. SACV 15-00718 (DFMx); SACV 15-00986; SACV 15-01362 JVS; CV 15-7492, 2016 U.S. Dist. LEXIS 86417 (C.D. Cal. June 7, 2016), did not mention the first part of *Great Northern*'s statement that the grants are to be "liberally construed."  The 2017 M-Opinion argues that *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979), rejected the canon that doubts about federal land grants are resolved in favor of the Government. *See* BLM 93.  *Leo Sheep* does state that "this Court long ago declined to apply this canon in its full vigor to grants under the railroad Acts."  *See* 440 U.S. at 682 (citing *Denver & Rio Grande Rwy.*, 150 U.S. at 14.).  However, *Leo Sheep* dealt with a railroad grant under the Union Pacific Act of 1862, rather than the 1875 Act, and did not grapple with the fact that *Great Northern* had reaffirmed the principle that doubts are resolved in favor of a sovereign. Moreover, *Leo Sheep* only stated that courts no longer applied the principle in its full vigor, suggesting that the presumption still had some role to play in interpreting land grants.  Thus, the Court would conclude that the principle still has some bearing on the discussion today.  The Court's conclusion is further bolstered, as discussed in the body of this tentative ruling, by the fact that *Brandt* cited the principle without stating that it had been overridden.

> not – for a very good reason. The Government's argument here is that it gave away *more* in the land grant than an easement, so that more should revert to it now. A principle that ambiguous grants should be construed in favor of the sovereign hurts rather than helps that argument. The dissent's quotation is indeed from *Great Northern*, where the principle was cited in support of the Government's argument that its 1875 Act grant conveyed "only an easement, and not a fee." *Id.*, at 271, 62 S.Ct. 529.

*Brandt*, 572 U.S. at 110 n. 5.

The Court agrees with Plaintiffs that the *expressio unius est exclusion alterius* is only of limited aid in interpreting the 1875 Act. First, the two more specific rights spelled out in the statute are of a different kind than the general right-of-way grant. Black's Law Dictionary defines a basic "right-of-way" as "[t]he right to pass through property owned by another." *See Right-of-Way*, Black's Law Dictionary (11th ed. 2019). A secondary definition relevant in this context is "[t]he right to build and operate a railway line or a highway on land belonging to another, or the land so used." *Id.* The right to take materials from public land and the right to use such land to build various facilities for the railroad does not necessarily go hand-in-hand with a basic right-of-way, or even the right to build or construct a railroad. As such, the fact that those rights are in addition to and limited to materials that are "necessary for the construction of said railroad," or specific types of railroad-related buildings does not necessarily speak to the scope of the right-of-way that the 1875 Act grants. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (holding the *expressio unius* canon "has force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence").

More fundamentally, however, the Court would apply *Great Northern*'s call to liberally construe the 1875 Act "to carry out its purposes," while still balancing that against the rule that "any ambiguity in a grant is to be resolved favorably to a sovereign grantor." *Great Northern*, 315 U.S. at 272. Even liberally construing the 1875 Act's purpose of encouraging railroad construction to foster settlement and enhance the value of public lands, there is no "clear and explicit" language in the statute granting railroads the right to lease their rights-of-way for purposes completely unrelated to the operation of the rail line. The BLM takes the language about the purpose of the 1875 Act from *Denver & Rio Grande Railway*, quoted above, and argues that the 1875 Act should be interpreted broadly to facilitate not only "westward expansion," but "economic development along rail lines." *See* BLM at 11. But the Court thinks that the first sentence from *Denver & Rio*

*Grande Railway*'s articulation of purpose is telling: "The general nature and purpose of the act of 1875 were manifestly *to promote the building of railroads* through the immense public domain remaining unsettled and undeveloped at the time of its passage."  150 U.S. at 8 (emphasis added). It was the building of the railroads themselves that was to foster economic development and enhance the value of the federal lands.  If anything, the quote that the 1875 Act was not a "bounty" to the railroads suggests, to a certain extent, that the grant was limited to rail companies building railroads.  That the building of the railroads would also benefit the public and increase the value of the federal lands, does not necessarily suggest that the rights granted to railroads included the ability to lease the rights-of-way for any purpose.

Further, and persuasive to the Court, the 1875 Act only granted easements to rail companies that actually built railroads.  *See* 43 U.S.C. § 934 (describing that a railroad company would receive a right of way "to the extent of one hundred feet on each side of the central line of said *road*," and could take certain materials for the construction of said *road*) (emphasis added).  If the 1875 Act was primarily concerned with economic development of the west, the granting of rights-of-way would not necessarily be tied to building a railroad.  Congress could have granted rights of way for anything that would aid in the development of the west; instead it granted easements for railroad companies to build railroads.  This purpose suggests that the scope of uses within the easements must somehow be related to railroads.  As such, the text and the purpose of the 1875 Act do not necessarily provide much guidance about the precise scope of the 1875 Act rights-of-way, except that they unquestionably were intended to foster the building of railroads.  Thus, the Court must examine the judicial gloss courts have placed on the 1875 Act over the intervening century-plus to determine whether the 2017 Determination's reliance on the 2017 M-Opinion was in accordance with the law.

### 3. Relevant Caselaw Interpreting the 1875 Act

It is beyond dispute that the 1875 Act rights-of-way are easements granted to the railroads. *See Brandt*, 572 U.S. at 110; *Union Pacific*, 353 U.S. at 119; *Great Northern*, 315 U.S. at 279.  Of course, simply determining that a grant is an easement does not necessarily delineate the scope of said easement.  Plaintiffs first argue that the 1875 rights-of-way are limited to railroad purposes based on "the Supreme Court's many opinions interpreting the statute's plain language and legislative history," as well as the opinions of various lower courts.  *See* Centers MSJ at 14; NPCA MSJ at 11-12.  The BLM counters that the Supreme Court has never decided the scope of

permissible uses of an 1875 Act right-of-way. *See* BLM Opp'n at 4. Next, both sides turn to general principles of property law to argue the breadth of the easements. *See* BLM MSJ at 12-15; NPCA MSJ at 10-12. Lastly, the BLM asserts that "longstanding practice supports a broad reading of the 1875 Act." *See* BLM MSJ at 15-16. The Court will address each argument in turn.

Plaintiffs primarily rely on three Supreme Court cases to support their argument that the 1875 Act rights-of-way require a railroad purpose.[20] First, Plaintiffs cite *Great Northern*. As discussed above, *Great Northern* described the legislative context in which Congress passed the 1875 Act. *Great Northern*, 315 U.S. at 272-273. In general, *Great Northern* concluded that the 1875 Act was passed in response to public backlash against the more-generous land grants to railroads during the preceding decades. *See id.* As such, *Great Northern* held that the 1875 Act granted an easement rather than any type of fee title to the land. *Id.* at 271-72 ("[T]he right granted is one of use and occupancy only, rather than the land itself."). In reaching the conclusion that the 1875 Act granted easements, the Supreme Court cited subsequent Congressional legislation describing the right as an easement. *Id.* at 276. A House of Representatives committee report on one of those subsequent bills confirming 1875 Act grants in the territories of Oklahoma and Arizona remarked "[t]he right as originally conferred and as proposed to be protected by this bill simply grants an easement or use for railroad purposes." *Id.* at 277. Nonetheless, *Great Northern* did not actually decide that the scope of easements under the 1875 Act is limited to activities that further railroad purposes, instead, the Court rejected the railroad's claim that it had "any right to the oil and minerals underlying its right of way," because it had an easement rather than a fee. *Id.* at 270, 279.

The "easement for railroad purposes" language took on further life when *Union Pacific* interpreted *Great Northern* as follows: "In that case we noted that a great shift in congressional policy occurred in 1871: that after that period only an easement for railroad purposes was granted." *Union Pacific*, 353 U.S. at 119. But, *Union Pacific* similarly did not decide the scope of an 1875 Act right-of-way because it was considering a grant under a pre-1871 railroad act and merely confirmed that the railroad did not have an interest in the mineral rights underlying the land grant. *See id.* at 113-14.

---

[20] The Centers also cite *Denver & Rio Grande Ry. Co.* and *Caldwell* but both cases are easily distinguishable in that they address the additional right to take timber along the rights of way for the purposes of railroad construction. *See Denver & Rio Grande Ry. Co.*, 150 U.S. at 12-13; *Caldwell*, 250 U.S. at 21. As such, the cases do not deal with the scope of the more generalized right-of-way grant.

Similarly, in *Brandt*, the Supreme Court did not have to confront the limitations of the scope of an easement under the 1875 Act. *See Brandt*, 572 U.S. at 106. Instead, *Brandt* simply held that the 1875 Act grant was an easement such that the United States had no reversionary interest in it when the railroad abandoned the easement and when the United States had patented the underlying land to a private citizen. *Id.* at 102, 106. Still, the Supreme Court added relevant gloss regarding the nature of the 1875 Act right-of-way, remarking that it was a "simple easement," in part because the United States had argued in *Great Northern* that "the 1875 Act granted an easement and nothing more." *Id.* at 103, 106. Further, the Supreme Court noted "granting an easement merely gives the grantee the right to enter and use the grantor's land *for a certain purpose*." *Id.* at 105 n.4 (emphasis added).

Thus, while the Court agrees with the BLM's statement that "the Supreme Court has not decided the scope of permissible uses of an 1875 Act right-of-way," *see* BLM Opp'n at 4, the various statements in the aforementioned cases are at least persuasive evidence that the Supreme Court would conclude that some relation to railroad purposes is required under the 1875 Act. Certainly, there are no Supreme Court cases holding or even really suggesting that a potential use – unrelated to the railroad – falls within the scope of an 1875 Act right of way so long as it does not interfere with railroad operations. In fact, the vast majority of courts that have considered the issue have concluded that a railroad purposes is necessary.

For example, last year, a district court in Utah analyzed the scope of an 1875 Act right of way and concluded that because "the lease agreements [at issue] do not serve a railroad purpose, they are unenforceable." *See L.K.L. Assocs., Inc. v. Union Pac. R.R. Co.*, No. 2:15-CV-00347-BSJ, 2018 WL 2433563, at *9 (D. Utah 2018). During the pendency of the case, the parties submitted the newly-issued 2017 M-Opinion. *Id.* at *1. Regardless, after reviewing the "text, history, [and] purpose of the 1875 Act," the court rejected the railroad's argument that the 1875 Act should be broadly construed to allow leases that are "incidental to or not inconsistent with" the easement's continued use as a railroad. *Id.* at *9 n.77. The BLM argues that *L.K.L* was wrongly decided, factually distinguishable, and non-binding on this court. Further, the BLM notes that the case is on appeal. *See L.K.L. Assocs., Inc.*, No. 18-4123 (10th Cir. Aug. 30, 2018). While the Court agrees that the case is factually distinguishable and non-binding, it still reviewed the statutory history and intent of the 1875 Act and concluded, like various other cases, that a railroad may only lease its right-of-way for railroad purposes.

Likewise, in *Home on the Range v. AT&T Corp.*, 386 F. Supp. 2d 999 (S.D. Ind. 2005), another district court rejected the "not interfere or inconsistent with" standard, albeit in response to the 1989 M-Opinion. *See* 386 F. Supp. 2d at 1024. The district court applied "the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it," *id.* at 1021 (quoting *Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 59 (1983)), and relied on the "railroad purpose" language from *Union Pacific* to hold that the Government's proffered interpretation was incorrect, *see id.* at 1022-23 (citing *Union Pacific*, 353 U.S. at 114). Because *Home on the Range* was decided in 2005, both the 2011 and 2017 M-Opinions analyzed its holding. While the 2011 M-Opinion largely agreed with the district court, the 2017 iteration concluded that the case was wrongly decided because it "appl[ied] the wrong canon of construction for railroad grants," and "over read[] dicta in *Union Pacific*." BLM 92. As already discussed above, the Court thinks that the 2017 M-Opinion wrongly writes off the canon of sovereign reservation based on its own overreading of *Leo Sheep*. *See supra* at 24 n.18. Further, *Home on the Range*'s reliance on so-called dicta from *Union Pacific* is not unreasonable. Although *Union Pacific* did not have the occasion to decide the scope of 1875 Act rights-of-way it still noted:

> [T]his right of way was granted Union Pacific "for the construction of said railroad and telegraph line." [Section 2 of the Act]. *That purpose is not fulfilled* when the right of way is used for *other purposes. See Northern Pacific R. Co. v. Townsend,* [190 U.S. 267, 271, 23 S.Ct. 671 (1903) ]. It would seem that, whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is *not a railroad purpose.*

*Home on the Range*, 386 F. Supp. 2d at 1022 (quoting *Union Pacific*, 353 U.S. at 114)).

Thus, the vast majority of cases that have considered the issue have concluded that some type of railroad purpose is required for a lease to fall within an 1875 Act right-of-way. *See Beres v. United States*, 64 Fed. Cl. 403, 418 (2005) ("These principles mandate that the 1875 Act be construed in a manner that recognizes what was passed to the railroads by the United States as a matter of law should not exceed the Congressional intent to grant easements for the limited purpose of promoting railroad development and operation. The 1875 Act easements by the 1875 Act's very terms, as validated by contextual history, were limited to railroad purposes."); *see also*

*Geneva Rock Prods., Inc. v. United States*, 107 Fed. Cl. 166, 171 (2012).[21]  The 2017 M-Opinion's conclusion that the scope of the rights-of-way is broader and encompasses all uses as long as they do not interfere with the railroad operations appears contrary to the 1875 Act.

  *4. Easement Law*

  Regardless, because no courts that would bind this one have directly answered the ultimate question, the parties turn to general principles of property law in support of their respective positions.  The BLM argues, and the 2017 M-Opinion relied upon, the following:  that an 1875 Act "is not an ordinary easement, but an easement in gross," that the easements also are "unusual in that they are exclusive use easements," and that such easements may be apportioned unless the apportionment "impose[s] an *unreasonable burden* on the servient estate."  *See* BLM MSJ at 12-13.  NPCA responds that the BLM's conclusion that the easements may be leased so long as the proposed use does not interfere with the operation of a railroad does not follow from the agency's assumptions that the easements are in gross and exclusive.  Plaintiffs contend that one of the first principles of easements, regardless of which kind, is that they only grant the right of entry to the grantor's land for certain purposes.  *See* NPCA MSJ at 11-12.

  As an initial matter, the Court is skeptical about the BLM's characterization of the 1875 Act rights-of-way as (somehow) "special" easements.  The BLM's assertion seems severely undercut by the Supreme Court's characterization of the right in *Brandt*.  There, the Supreme Court reaffirmed *Great Northern*'s principle that a right-of-way pursuant to the 1875 Act "was a simple easement," not an easement with special rights.  572 U.S. at 110.  Considering that the 2017 M-Opinion's purported purpose was to revisit the 2011 M-Opinion in light of new cases such as *Brandt*, it is strange that the 2017 version did not mention *Brandt*'s straightforward holding on this point.  As explained below, the fact that the easements seem to be exclusive does not grant the holder the right to lease access to the easement for any and every use.

  In support of the 2017 M-Opinion's characterization of the easements as exclusive, the

---

[21] As stated in *Geneva Rock Prods.*, 107 Fed. Cl. at 171:

> This statutory text delineates the contours of the grant with specificity.  Given the location and existence of a "central line" of a railroad, the easement extended one hundred feet on either side of the line.  Use of material, earth, stone, and timber on the easement-burdened property was restricted to the amount necessary for the construction of the railroad itself.  Allowances were made for other railroad-related structures, specifically station buildings, depots, machine shops, side tracks, turnouts, and water stations, but for no other type of activity.  Additionally, railroad use could not hinder the utility of other modes of transportation. * * * * In sum, the text of the 1875 Act implies the grant of a narrow and specific easement for railroad purposes only.

BLM cites a 1985 decision from the district of Idaho and two Supreme Court cases from around the turn of the twentieth century.  First of all, the two Supreme Court cases are inapposite as both deal with pre-1875 Act grants to the railroads, and both express skepticism that such grants were easements.  *Western Union* itself states as much:

> A railroad right of way is a very substantial thing.  It is more than a mere right of passage.  It is more than an easement.  We discussed its character in *New Mexico* v. *United States Trust Co.* 172 U. S. 171, 43 L. ed. 407, 19 Sup. Ct. Rep. 128.  We there said that if a railroad's right of way was an easement it was 'one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal, property.'

*See W. Union Tel. Co. v. Penn. R.R. Co.*, 195 U.S. 540, 570 (1904) (quoting *New Mexico v. U.S. Trust Co.*, 172 U.S. 171, 183 (1898)).  The Court would also find that the Idaho district court decision, *Idaho v. Oregon Short Line Railroad Co.*, 617 F. Supp. 207 (D. Idaho 1985), is dead letter after *Brandt*, an issue which the 2017 M-Opinion fails to contemplate or address.  In *Oregon Short Line*, the district court held that the United States must have retained some interest in the 1875 Act rights-of-way because 43 U.S.C. § 912 (and related provisions) were supposedly "specifically enacted to dispose of the . . . retained interest."  *Id.* at 212.  The district court recognized that *Great Northern* characterized the grants as easements and that, "under traditional rules, a simple easement carries with it no right to exclusive use and occupancy of the land."  *Id.* at 212.  Nevertheless, the district court concluded that the 1875 Act must have granted something more: "Congress did, however, intend to give the railroads an interest suitable for railroad purposes – a right-of-way, which, by definition, carried with it the right to exclusive use and occupancy of the land."  *Id.  Brandt* not only dispels *Oregon Short Line* by specifically calling the 1875 Act rights-of-way "simple easements," but by holding that the United States did not retain any interest in an abandoned right-of-way.  572 U.S. at 110.

Regardless, the parties do not vigorously dispute the exclusivity of the easements.  In fact, the 2011 M-Opinion referred to the easements' exclusivity.  *See* BLM 8045 n.15.[22]  However, as

---

[22] Cadiz adds only two arguments to BLM's support of the interpretation set forth in the 2017 M-Opinion.  *See* Cadiz MSJ at 10-11.  First, Cadiz argues that the 1875 Act "states that where the [right-of-way] runs through a 'canyon, pass or defile,' the holder of the [right-of-way] must allow other railroads to use the [right-of-way]."  *Id.* at 10 (citing 43 U.S.C. § 935.)  Cadiz claims that "this exception would not be necessary if the 1875 Act had not granted the holder of the [right-of-way] the exclusive use and occupancy of the [right-of-way]."  Cadiz MSJ at 10.  However, Cadiz' argument does not make sense.  The fact that the 1875 Act (*see* 43 U.S.C. § 935) specifically provides that the railroad's right of way shall be subordinated to wagon roads or highways located at canyons and passes hardly

explained below, the distinction between exclusive and non-exclusive may not matter much.

"Because granting an easement merely gives the grantee the right to enter and use the grantor's land for a certain purpose," and because the purpose here was unquestionably for the railroad companies to build railroads,[23] the Court would be inclined to conclude that the scope of the rights-of-way only extends so far.  *See id.* at 105 n.4; *see also* see Restatement (Third) of Property: Servitudes § 1.2(1) (1998) (an easement is a "nonpossessory right to enter and use land in the possession of another and obligate[s] the possessor not to interfere *with the uses authorized by the easement*." (emphasis added)); *id.* § 4.1(1) ("A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out *the purpose for which it was created*." (emphasis added)); *id.* § 4.9, Comment c ("An easement is a nonpossessory interest that carves out specific uses for the servitude beneficiary.").

Both sides cite the Restatement (Third) of Property: Servitudes § 4.10, Comment d in support of their positions.  The 2017 M-Opinion cites the comment for the premise that "[t]he purpose of an easement created by express grant or necessity is often defined more generally."  *See* BLM 90 n. 81.  BLM's reliance on this comment is fine but incomplete.  First, as NPCA points out, Comment d begins, "[t]he first step in determining whether the holder of an easement is

---

demonstrates that Congress granted to railroads an all-encompassing and exclusive easement.  *See Geneva Rock Prods.*, 107 Fed. Cl. at 171.

Cadiz's second argument is that "the shift in public policy from the pre-1871 railroad statutes to the 1875 Act has no bearing on the question of whether the 1875 Act granted railroads the exclusive use and occupancy of their [rights-of-way]."  Cadiz MSJ at 11.  Cadiz expands on the point, arguing that "[w]hile the 1875 Act granted the railroads only a 200 foot wide easement, it did not change the exclusive use and occupancy rights that the railroads enjoyed in the land used for railroad operations."  Cadiz does not provide a citation for this assertion, but the point seems relatively uncontroversial among the parties.

[23] The 2017 M-Opinion itself admits as much:

> [I]t is clear that the construction and operation of a railroad is a condition of the 1875 Act easements. Section 1 grants land to " 'any railroad company,' defines the geographic scope of the right-of-way by reference to the "central line of said road," limits the ability of railroads to utilize resources on adjacent public lands to those necessary "for the construction of said railroad," and limits the use of adjacent public lands for ancillary structures "to the extent of one station for each ten miles of road."   Section 4 is explicit on this score, providing that "if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road."  Thus, Congress conditioned the right-of-way granted under the 1875 Act on the construction and operation of a railroad.

BLM 86-87.

entitled to make a particular use challenged by the owner of the servient estate is to determine whether *the use falls within the purposes for which the servitude was created*." (emphasis added). Moreover, the comment even uses the following example:

> The purpose of an easement for "railroad right of way" may be narrowly defined as transportation by railroad, or more generally defined as transportation or movement of people and goods.  If the former is adopted, the right of way could only be used for rail transport; if the latter is adopted, it could be used for a hiking and bicycle trail.

Restatement (Third) of Property: Servitudes § 4.10, Comment d.  Therefore, even when defining the purpose at a higher level of generality, the touchstone of the analysis is still whether something falls under a given purpose, in this case a "railroad purpose," and not whether something merely does not interfere with such purpose.

Further, assuming that the 1875 Act rights-of-way are exclusive easements, it does not follow that the railroad can then use an easement for any purpose it sees fit.  The district court in *Oregon Short Line* noted that the easements were exclusive but stated that Congress granted "an interest suitable for *railroad purposes*." 617 F. Supp. at 212 (emphasis added).  Moreover, the purpose of the underlying easement is still relevant to the analysis of exclusive easements.  As discussed in the Restatement (Third) of Property:  Servitudes, "Grant of an exclusive easement deprives the servient owner [the United States here] of the right to use either the entire area covered by the easement, or, more frequently, of the right to use facilities installed for enjoyment of the easement."  Restatement (Third) of Property:  Servitudes § 5.9, Comment b.  And it is true that an exclusive easement is more likely to be divisible – meaning assignable to other parties.  *Id.* However, even for an exclusive easement, where the "servient owner cannot use the easement facilities, additional use by others should be of little concern unless the additional use . . . *is outside the scope of the easement*."  *Id.* (emphasis added).

Finally, the 2017 M-Opinion argues that the scope of the easements should be interpreted broadly to include all uses that do not interfere with railroads because railroads are "very substantial things," in that they are loud and require ancillary structures to support the transport of freight, including hazardous materials.  *See* BLM at 91-92.  The BLM took the "very substantial things" language from *Western Union*, which uses the phrase to describe pre-1875 Act railroad rights-of-way and not railroads themselves.  *See Western Union*, 195 U.S. at 570.  The statement's inapplicability here is therefore evident.  Further, and more fundamentally, BLM's reasoning on

this point lacks sense; because trains are loud and require a lot of facilities, the railroad company should be allowed to lease the right of way for any purpose it likes – purposes completely unrelated to these loud and important operations?

The BLM's problem is that there is a logical gap from the easements' being granted for a broad purpose to the conclusion that scope of the easement is so permissive that it allows all uses as long as they do not interfere with the broad purpose. The BLM cannot get around the fact that the 1875 Act rights-of-way were granted for a purpose and that any use that does not further that purpose is outside the scope of the easement.[24] Thus, the Court would conclude that even interpreting the easement broadly does not support the 2017 M-Opinion's conclusion that scope extends to any use that does not interfere with the railroad.

### 5. Prior Use

The BLM's final argument in favor of the 2017 M-Opinion's primary conclusion is that there is a longstanding belief among railroad companies that they had the ability to lease their rights-of-way to third parties, and that this belief did not extend only to leases for uses that would further railroad purposes. *See* BLM 94-96; BLM MSJ 15-16. According to the BLM, longstanding expectations are significant because of the "the special need for certainty and predictability where land titles are concerned." *See Brandt*, 572 U.S. at 110 (quoting *Leo Sheep*, 440 U.S. at 687).

First, the 2017 M-Opinion cites testimony from railroad representatives given to a congressional subcommittee in 1961:

> Southern Pacific Railroad, making no distinction between rights-of-way obtained under the 1875 Act and land obtained through other transactions, represented that it had entered into leases "covering the use of portions of such rights-of-way for warehouse, industrial, storage, and related purposes in connection with the shipment and delivery of freight by rail," as well as leases with adjacent landowners and others "for other purposes." Southern Pacific went on to clarify its view that such leases need not be limited to specific railroad purposes, stating "[i]t is judicially recognized that a railroad company is entitled to lease portions of its rights-of-way for nonrailroad purposes subject to termination upon reasonably short notice when required for railroad purposes."
>
> In the same hearing, the Vice President and Western General

---

[24] As alluded to below, the requirement of a "railroad purpose" may be broadly defined pursuant to the incidental use doctrine.

> Counsel of Union Pacific Railroad Company represented that Union Pacific had entered into approximately 2,000 leases for industrial and manufacturing purposes and an additional 2,000 leases, covering approximately 1,878 miles, for agricultural purposes. Union Pacific went on to note that many of these agricultural leases were defensive in nature, entered into to allow adjacent landowners to enter and utilize portions of the Union Pacific rights-of-way without creating a potential claim over the land through adverse possession. Union Pacific further clarified that these lease numbers did not account for the "hundreds of persons and companies who have licenses to cross [Union Pacific's] granted right-of-way with highways, pole lines, wire lines, pipelines, etc.

BLM 77-78 (footnotes omitted). Finally, the BLM argues that lessees have relied on the ability to use rights of way to lay fiber optic cable and other utility features. *See* BLM 95; BLM MSJ at 16.

For a few reasons, the Court is hesitant to put too much stock into the BLM's arguments. For one, the BLM and 2017 M-Opinion provide no context for the 1961 testimony from various (interested) railroad officials. How would the proposed resolutions have changed the 1875 Act, for example? Further, the fact that the railroad officials "[made] no distinction between rights-of-way obtained under the 1875 Act and land obtained through other transactions," is troubling and flies in the face of the shift in policy described in *Great Northern*. Moreover, the testimony is vague as to what "other purposes," companies entered into leases for and which courts "judicially recognized" such leases. *See* BLM 8435, 8441. In addition, the Court could pick out quotes from the testimony suggesting that the railroads believed a railroad purpose was necessary:

> Many court cases have considered the question of what use a railroad company can make of its right-of-way where it has been held that the right-of-way is less than fee title. Generally speaking, railroads are entitled to use the right-of-way which they have for
>
> > any use Indispensable to, or which will facilitate the fulfillment of, the objects of their corporate existence. (See 44 Am. Jur. 338.)
>
> Whether or not the use or proposed use of its right-of-way by a railroad company is necessary for railroad purposes is
>
> > primarily a matter to be determined by the company in the exercise of its Judgment, and the courts will not interfere with the use and occupancy of its right-of-way by a railroad company, in the absence of a finding, supported by evidence, that such use occupancy is not necessary for railroad purposes, is in bad faith, and not the result of the honest exercise of the judgment of the company. (See 44

Am. Jur. 340.)

*See* BLM 8447.

What further gives the Court pause is that many of the uses specified could very well be railroad purposes including leases to utility companies and defensive leases to protect against adverse possession claims. Lastly, as pointed out by NPCA, the BLM did not consider the interests of private landowners who hold estates subject to the rights-of-way. *See* NPCA Opp'n at 15. Since at least *Great Northern*, these landowners have believed that the railroad's interest on the estate was limited to an easement. The BLM did not discuss whether such private landowners would expect a water pipeline to be built across said easement.[25]

In the end, any leases for non-railroad uses may very well have been outside the scope of the easements granted in the 1875 Act. That the BLM did not enforce the limits of those easements does not weigh against the persuasive authority in favor of requiring a railroad purpose within the rights-of-way.

For the foregoing reasons, to the extent the 2017 Determination relies on the 2017 M-Opinion's expressed standard, that any use falls within the scope the scope of an 1875 Act right-of-way so long as it does not interfere with railroad operations, the agency decision was contrary to law and the Court would be inclined to rule in Plaintiffs' favor.

### 6. *Pretext*

Because the Court is inclined to conclude that the 2017 Determination's primary decision applied an incorrect legal standard, the Court does not believe it needs to reach NPCA's alternative argument that the determination was arbitrary and capricious because it rested on supposedly pretextual rationalizations. *See* NPCA at 16-20. Regardless, the Court provides some of its thinking on the issue.

The Court would note that NPCA's proffered evidence at least raises a question as to whether the agency's decisionmaking process was focused on reaching an intended result. The direction from Cason to "get rid of" the 2011 M-Opinion and to "take the 'M' Opinion, look at the facts, and write an analysis that says the facts suggesting railroad benefits were ignored," do not look great for the agency in the abstract. NPCA ¶ 89. The Court realizes, however, that these

---

[25] While most likely not relevant to the outcome of this case, the Court ponders what would happen if Cadiz built the pipeline and then ARZC abandoned the right-of-way. Would the continued operations of the pipeline mean that the right-of-way remained active? Would ARZC keep operating the railroad just so that the pipeline could keep its right-of-way?

quotes are from a "task matrix," and are not necessarily determinative. *See Jagers v. Fed. Crop. Ins. Corp.*, 758 F.3d 1179, 1185- 86 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion."). Further, as BLM points out, Cason had no authority to make the decision, and the Interior Solicitor thereafter spent months revising the agency's legal opinion. *See* BLM Opp'n at 24. And, simply coming into a new administrative with a belief about the correct course of events does not necessarily mean that a decision was arbitrary and capricious. *See* BLM Opp'n 24-25. The fact that Interior Secretary Bernhardt previously worked on Cadiz's behalf again may raise some question of intent, but the BLM rebuts this fact by attaching a recusal memo from Bernhardt. *See* Bernhardt Recusal Memo, Docket No. 57-1. There is no indication that the Secretary violated his recusal.[26]

Even assuming that the BLM had an intended result in mind in reviewing the 2011 M-Opinion, the Court would note that there is no real indication of procedural irregularities.

---

[26] NPCA relies on the recent "census question" cases where various district courts have held that the Secretary of the Department of Commerce, Wilbur Ross, provided a pretextual reason for adding a citizenship question to the census. *See California v. Ross*, 358 F. Supp. 3d 965, 1040 (N.D. Cal. 2019), *petition for cert. filed*, No. 18-1214 (U.S. Mar. 18, 2019); *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 660 (S.D.N.Y. 2019), *appeal filed*, No. 19-212 (2d Cir. Jan. 22, 2019), *cert. granted before judgment, U.S. Dep't of Commerce v. New York*, 139 S. Ct. 953 (Feb. 15, 2019). Ross stated that the purpose of including the citizenship question on the census was "to promote [Voting Rights Act] enforcement." *New York*, 351 F. Supp. 3d at 516. The Southern District of New York summarized the evidence of pretext:

> As discussed above, that conclusion is supported by evidence in the Administrative Record alone, including evidence that Secretary Ross had made the decision to add the citizenship question well before DOJ requested its addition in December 2017, AR 3702, 3710, 12476; the absence of any mention, at all, of VRA enforcement in the discussions of adding the question that preceded the Gary Letter, see AR 763-64, 2424, 2458, 2521-23, 3710, 3984, 4004; unsuccessful attempts by Commerce Department staff to shop around for a request by another agency regarding citizenship data, AR 12755-56; and Secretary Ross's personal outreach to Attorney General Sessions, followed by the Gary Letter, AR 2528, 2636, 4004; see AR 1321; not to mention the conspicuous procedural irregularities that accompanied the decision to add the question. When one considers evidence outside the Administrative Record, as the Court may do for this purpose, see, e.g., Overton Park, 401 U.S. at 420, 91 S.Ct. 814, the conclusion is inescapable. That record includes the testimony from Comstock all but admitting that Secretary Ross had made up his mind to add the citizenship question in the spring of 2017, Comstock Dep. 146; testimony that senior aides to Secretary Ross had no idea why he decided to add the question, see id. at 112; Teramoto Dep. 32; a near-admission from Comstock that he went searching for a request from other agencies because the Commerce Department "would need to clear certain legal thresholds" to add the citizenship question that it otherwise would not be able to, and that it was his role to "find the best rationale" to support the addition of the question, Comstock Dep. 153-55, 266-67; and testimony from AAAG Gore that conversations between DOJ and the Commerce Department about adding a citizenship question were not initiated by DOJ.

Id. at 661.

Moreover, there is no indication that the BLM ignored advice – either internal or from other agencies – contrary to a revision of the 2011 M-Opinion.  In short, Plaintiffs would need to show a lot more before the Court would entertain a pretext finding.

    D.  Legality of the 2017 Determination – "Railroad Purposes" Alternative Conclusion

    Alternative to its conclusion that the Cadiz Project did not interfere with ARZC's use of the right-of-way for railroad operations, the 2017 Determination stated that, even if a railroad purpose were required, the project would further such a purpose "consistent with the historical understanding of the incidental use doctrine."  BLM 5.  The BLM argues that the Court may uphold the 2017 Determination based on this alternative conclusion.  *See* BLM MSJ at 21-24.  Plaintiffs contend that the alternative decision is arbitrary and capricious because it does not sufficiently explain the reversal from the 2015 Determination.  *See* Centers MSJ 18-21; NPCA MSJ at 21-24.

    *1.  Incidental Use Doctrine*

    The Ninth Circuit recently defined and discussed the incidental use doctrine in *Barahona*. *See Barahona v. Union Pac. R.R. Co.*, 881 F.3d  1122, 1135 (9th Cir. 2018).  As *Barahona* explained:

> It is beyond dispute that a railroad right of way confers more than a right to simply run trains over the land.  *See New Mexico v. U.S. Trust Co.*, 172 U.S. at 183, 19 S.Ct. 128.  As a result, courts have approved a variety of uses incidental to railroad operations.  *See Illig v. United States*, 58 Fed. Cl. 619, 634 (2003) (power lines); *Mellon v. S. Pac. Transp. Co.*, 750 F. Supp. 226, 231 (W.D. Tex. 1990) (communication lines); *McSweyn v. Inter-Urban Ry.*, 256 Iowa 1140, 130 N.W.2d 445, 448 (Iowa 1964)(fuel storage); *Miss. Invs., Inc. v. New Orleans & N.E. R.R.*, 188 F.2d 245, 247 (5th Cir. 1951) (freight warehouses "and other like structures"); *Mitchell v. Ill. Cent. R.R.*, 384 Ill. 258, 51 N.E.2d 271, 275 (1943) (gas station and storage tanks).  The Supreme Court has embraced this so-called "incidental use doctrine," although not specifically in connection with the pre–1871 Acts or the 1875 Act:
>
>> [W]hile it must be admit[t]ed that a railroad company has the exclusive control of all the land within the lines of its roadway, and is not at liberty to alienate any part of it so as to interfere with the full exercise of the franchises granted, we are not prepared to assert that it may not license the erection of buildings for its convenience, even though they may be also for the convenience of others.  It is not doubted that the [railroad] might have erected similar structures on the ground on which the plaintiffs' buildings were placed, if in its judgment the structures were convenient for the receipt and delivery of freight on its road.  Such erections

> would not have been inconsistent with the purposes for which its
> charter was granted.  And, if the company might have put up the
> buildings, why might it not license others to do the same thing
> for the same object; namely, the increase of its facilities for the
> receipt and delivery of freight? The public is not injured, and it
> has no right to complain, so long as a free and safe passage is left
> for the carriage of freight and passengers.
>
> *Grand Trunk R.R. v. Richardson*, 91 U.S. 454, 468–69, 23 L.Ed. 356
> (1875) (construing rights of railroad chartered under Vermont
> statute).  Even *Union Pacific* recognized that the 1862 Act conferred
> "all rights *incident to* a use for railroad purposes." 353 U.S. at 119,
> 77 S.Ct. 685 (emphasis added).

*Id.*  The Ninth Circuit, however, noted that the doctrine has limits:  "We acknowledge that an appurtenance might be of such minimal or illusory benefit to railroad operations as to make the incidental-use doctrine inapplicable."  *Id.* at 1135.

Thus, as an initial matter, *Barahona* forecloses NPCA's suggestion that the incidental use doctrine may not apply to 1875 Act rights-of-way.  *See* NPCA MSJ at 13-14.  In *Barahona*, a railroad claimed that it would get to use some of the oil from a pipeline within its right-of-way, and the Ninth Circuit held that the railroad "has plausibly alleged that the benefit it derives from the pipeline is sufficient for the [incidental use] doctrine to apply."[27]  *See Barahona*, 881 F.3d at 1135.

NPCA's further suggestion that the incidental use doctrine may not be used to bring activities that do not serve a railroad purpose within the scope of an easement granted under the 1875 Act is true but not revelatory or determinative.  Rather, the incidental use doctrine informs what may be considered a "railroad purpose."  *See id.* at 1134.  Indeed, the 2011 M-Opinion concluded that the incidental use doctrine was relevant to determining what constitutes a railroad purpose.  *See* BLM 8045-47; *id.* at 8048 ("MCI's [fiber optic] line furthered, at least in part, a railroad purpose, as required by the incidental use doctrine, and therefore, Southern Pacific had the authority to approve the installation of MCI's line in its ROW across BLM-administered lands without approval from the Department.").   The 2017 M-Opinion came to basically the same

---

[27] *Barahona* did not definitively conclude that the oil use fell within the scope of the right-of-way.  Instead, because the issue was raised in the context of a motion to dismiss, the Ninth Circuit merely decided that the railroad had alleged that such use could plausibly fall within the right of way.  *Id.* at 1134.  As Plaintiffs recognized during the June 20, 2019 hearing, the question of whether the components of the Cadiz Project fall under *Barahona*'s articulation of the incidental use doctrine is not before the Court at this time.

conclusion.  *Compare* 2017 M-Opinion at BLM 99 ("Thus, even assuming that an 1875 Act right-of-way is limited to a 'railroad purpose,' as long as the proposed use is not otherwise prohibited, provides some incidental benefit to the railroad, and does not inhibit the continued use of the right-of-way for railroad operations, the railroad company may lease land within their 1875 rights-of-way for third party uses.") *with* 2011 M-Opinion at BLM 8047 ("[R]ailroads have the right to undertake a range of activities within their ROWs, including commercial activities, so long as the activity is derived from or furthers a railroad purpose consistent with the [incidental use doctrine] discussion above. A railroad's right to undertake activities within an 1875 Act ROW includes the right to authorize other parties to undertake those same activities.").[28]

As such, the Court would find that the 2017 Determination's alternative reliance on the incidental use doctrine to inform what constitutes a railroad purpose was not contrary to law.

### 2. *Sufficient Explanation of Reversal*

The Plaintiffs' primary argument that the 2017 Determination's alternative decision was arbitrary and capricious is that the 2017 Determination provides no explanation for reversing the 2015 Determination.  *See* Centers MSJ 21-23.  Specifically, Plaintiffs argue that the 2017 Determination's factual findings directly contradict those in the 2015 Determination without an explanation for the change.  *Id.*  The BLM responds that the agency did not need to provide a more fulsome explanation because the "BLM did not rely on facts that contradicted those underlying the 2015 determination regarding the Cadiz Pipeline; instead it reevaluated those facts based on a different interpretation of the relevant law and reached a different result."  BLM Opp'n at 10.

As set forth by the Supreme Court:

> [A] policy change complies with the APA if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc)

---

[28] To the extent Plaintiffs are suggesting that the proposed railroad uses in the Cadiz Project are so illusory as to fall outside of the incidental use doctrine, the Court would find that Plaintiffs have not sufficiently developed this argument.  Regardless, if they are challenging the 2017 Determination on such a theory, the Court would think that the agency is entitled to deference on its decision that the uses are within the scope of the doctrine.

(quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).  A policy change based on a different interpretation of the law does not require the same "reasoned explanation" of the change, but requires some analysis even if "not so precise, detailed, or elaborate as to be a model for agency explanation."  *See Fox*, 556 U.S. at 538

The Court will start with Defendants' argument first.  Both the BLM and Cadiz contend that, even when it comes to the incidental use doctrine, the 2017 Determination applied a different interpretation of that doctrine than the one applied in the 2015 Determination.  *See* BLM Opp'n at 11; Cadiz Opp'n at 13.  As the Court noted above, the 2011 and 2017 M-Opinions both incorporate the incidental use doctrine into the definition of furthering a railroad purpose.  *Compare* 2017 M-Opinion at 99 *with* 2011 M-Opinion at BLM 8047.  Further, on the face of the M-Opinions, the Court sees no real difference between the agency's understandings of the incidental use doctrine.  However, the true target of Defendants' attack is the 2014 IM that set out criteria on how the BLM should apply the legal interpretation of the 2011 M-Opinion.  *See* BLM Opp'n at 11; Cadiz Opp'n at 13.

The BLM focuses on the fact that the 2014 IM placed the burden on the right-of-way holder to "provide sufficient evidence to overcome any doubts as to whether a particular activity is within the scope of the [right-of-way]."  BLM Opp'n at 11 (quoting BLM 2727).  Cadiz, in turn, attacks the so-called "originate or derive from" standard that the 2014 IM supposedly established.  The Court would note that neither the 2014 IM nor the 2011 M-Opinion use the phrase "originate or derive."  The 2011 M-Opinion concluded that right-of-way holders could lease their easement to various uses so long as those activities "derive[d] from or further[ed] a railroad purpose."  *See* BLM 8038.  The 2014 IM Opinion, in setting out eight factors for the agency to use to determine whether an activity falls within the scope of an 1875 Act right-of-way, stated that "[a]n activity 'derives from' a railroad purpose if it comes from, originates, or issues from a railroad purpose.  It 'furthers' a railroad purpose if it promotes or advances the purpose."  BLM at 2731.  Similarly, the 2015 Determination does not use the phrase "originate or derive."  *See generally* BLM 2260.  To the extent Cadiz uses the "originate or derive" phrase as short-hand for one of the factors that the 2014 IM articulated, the Court would also note that the 2015 Determination considered both whether certain uses derived from *or* would further a railroad purpose:

> Depending on the nature and location of the rail line, fire suppression *may further a railroad purpose* inasmuch as rail lines in certain locations may be more susceptible to fire; in addition,

41

> water may be the appropriate substance to extinguish fires in certain circumstances. *However, under the circumstances presented here, fire suppression facilities are not justified . . . .*
>
> The inconsistent treatment of the 43 miles of line through public land, the uncommon use of water for fire suppression according to industry standards, and the historical lack of fire *do not support a finding that the fire suppression facilities and use of water for fire suppression support a railroad purpose*. Activities that derive from or further a railroad purpose must actually come from, originate, or issue from the railroad purpose. Here, there is no operational evidence that fire suppression, on this limited stretch of line, comes from, originates, or issues from a railroad purpose. On this basis, the installation of water-based fire suppression utilities requires approval from BLM.

BLM 2268-69 (footnote omitted) (emphasis added);  *see also* BLM 2272-73 ("Here, Cadiz, Inc. would need to seek an authorization from BLM to construct, maintain and improve the access road within the Railroad ROWs because Cadiz, Inc.'s inclusion of an access road with the water conveyance pipeline does not provide factual support for a conclusion that the pipeline furthers a railroad purpose simply because of the access road.").  Thus, using the definition of "furthers" from the 2014 IM, it seems to the Court that the 2015 Determination also considered whether certain components "promote[d] or advance[d]" the railroad purpose, aside and apart from whether they "originated" from the purpose.  *See* BLM at 2731.

There is no doubt, however, that the 2015 Determination applied the guidance set forth in the 2014 IM, and that the 2017 Determination disagrees to some extent with the criteria established in the 2014 IM.  *See* BLM at  4 (describing how the 2015 Determination was based on the 2014 IM, which was based on the 2011 M-Opinion, which the 2017 IM and 2017 M-Decision rescinded).  Thus, to some extent, the Court agrees with Defendants' argument that the 2017 Determination applied a new legal standard to the same underlying facts.  However, the BLM's application of the supposedly new legal standard only gets it so far because *both* the 2015 and 2017 Determinations *also* applied the same legal standard in some instances: whether the uses further a railroad purpose consistent with the incidental use doctrine.

Part of the problem for Defendants is that the legal standard it applies in the 2017 Determination is not precisely described.  The BLM argues that "[t]he bases for the changed legal interpretation in the [2017] M-Opinion are amply explained in the 25-page [2017] M-Opinion," *see* BLM Opp'n at 9, but the 2017 M-Opinion does not address the fact that the 2011 M-Opinion

also cited the incidental use doctrine.  Nor does the 2017 M-Opinion address the criteria set forth in the 2014 IM.  Further, the 2017 IM rescinding the 2014 IM provides no explanation for the withdrawal of the guidance.  *See* BLM 971-972.  The 2017 Determination's only explanation of a changed legal standard is "the activities proposed in the Cadiz Project further a railroad purpose, even if they do not originate or derive from that purpose."  BLM at 5.  But, as discussed just above, the 2014 IM and 2015 Determination both contemplated that a proposed use could fall within the scope of a right of way if the use furthered *or* originated from a railroad purposed.  The BLM, thus, never explained how the 2011 M-Opinion's interpretation of the incidental use doctrine was different from the 2017 Determination's alternative reliance on the doctrine.

Therefore, the Court would be inclined to find that both the 2015 Determination and 2017 Determination reviewed the same facts but came out differently as to whether those facts demonstrated that the Cadiz Project furthered a railroad purpose consistent with the incidental use doctrine.  Thus, the Court thinks that the BLM had the duty to provide a "reasoned explanation . . . for disregarding [certain] facts" underlying the 2015 Determination.  *See Organized Village of Kake*, 795 F.3d at 966.

To be comprehensive, the Court copies below the BLM's full explanation of its reversal of the 2015 Determination:

> The BLM additionally and alternatively concludes that the activities proposed in the Cadiz Project further a railroad purpose, even if they do not originate or derive from that purpose. Specifically, these components further a railroad purpose as follows:
>
> 1.  Water pumped through the Cadiz pipeline will enable the creation and operation of a new fire suppression system to prevent and minimize damage to railroad assets and disruption of railroad operations.  Cadiz proposes to construct and provide water for a fire suppression system to protect against fire for the 13 steel and 29 wooden railroad bridges that utilize creosote-treated timber trestles and ties.  The components of the fire suppression system would consist of automatic sprinklers and fire hydrants.  The system would require the construction of fiber optic lines used for telemetry, for pipeline communications by Cadiz, and for emergency communications by ARZC.
>
> 2.  Water pumped through the Cadiz pipeline will generate power that will be used in railroad operations.  Cadiz also proposes to install in-line turbines within the water conveyance pipeline for the purpose of generating power, in part for ARZC to use for key railroad operations such as expanding and providing power for new railroad transloading facilities, signal systems, and power switches for potential increases in railroad activity.
>
> 3.  The project will provide transmission lines to bring electrical power that enables ARZC to install climate controlled storage containers, provide around the clock maintenance, and improve railroad security.  The Cadiz Project includes the installation of power lines to support necessary power distribution (including power generated by the in-line turbines) for the water conveyance pipeline.  These power lines would in turn support

43

> ARZC's installation of facilities for heating and refrigeration of containers, lighting for more efficient night-time operations, and surveillance cameras to help prevent vandalism at an existing side-track, as well as lightening at additional locations.
>
> 4.  Cadiz proposes to provide ARZC with access to 10,000 gallons of water a day pumped through the pipeline for their future purposes, including, but not limited to, use at a rail car wash site, vegetation control, use in offices, or other potential improvements.
>
> 5.  Pipeline operation and maintenance will require the construction of an access road that will facilitate smoother railroad operations. Cadiz proposes to construct a 20-foot access road along ARZC's ROW to install, construct, operate, maintain, repair, renew and remove the pipeline and related facilities. The access road will be available to ARZC and provide ARZC with easier access to railroad facilities and assets to assist in crew changes, maintenance and inspection of the railroad, and emergency responses.
>
> 6.  Water piped through Cadiz pipelines will enable the operation of a steam-based exclusion train on the ARZC rail line. Cadiz also proposes to operate a steam-based excursion train for tourists that utilizes water from the conveyance pipeline. Operation of such a tourist train would necessarily depend on the water obtained from the water pipeline.
>
> As the railroad itself describes, these component elements of the Cadiz project all provide "critical benefits" to the railroad that facilitate elements of its operations. Accordingly, consistent with the incidental use doctrine, the benefits associated with the Cadiz Project further a railroad purpose.

*See* BLM 5-6.

As to each of these proposed uses, the 2015 Determination made factual findings. For example, as to the fire suppression system, the 2015 Determination described that it was not common to use water to suppress fires on creosoted structures, and that dry sand is the preferred method. *See* BLM 2268. The 2015 Determination further noted that there was no history of fire along the proposed pipeline. *Id.* The Court would of course defer to the BLM's determination if it thought that the 2015 Determination was wrong on these and similar facts. But, the 2017 Determination made no attempt to rebut such facts, it simply discarded them. *See* Centers MSJ 21-22. The 2017 Determination's conclusion that water would serve the railroad's fire suppression needs directly contradicts the 2015 Determination's decision that water would not. It is well within the agency's discretion to re-weigh facts, but it cannot directly contradict findings without an explanation. *See Organized Village of Kake*, 795 F.3d at 968; *see also Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, No. 18- 00029, 2019 WL 1437596, at *6-10 (D. Alaska Mar. 29, 2019); *Indigenous Envtl. Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 582-83 (D. Mont. 2018). This is especially so where pretext is alleged.

The 2015 Determination made further factual findings regarding the other proposed uses. And, as the BLM and Cadiz point out, the 2015 Determination admitted that certain components

of the plan could further a railroad purpose.  For example, the 2015 Determination agreed that electrical transmission lines could further a railroad purpose but that the agency needed more information.  *See*  BLM 2276.  The 2017 Determination did not explain why such further information was no longer necessary.  Similarly, as to the 10,000 gallons of water per day, the 2015 Determination did not consider the uses for that water because they were described "as possible, not proposed, future improvements."  *Id.* at 2266.  The 2017 Determination does not discuss whether the uses were possible, proposed, likely, or planned.  *Id.* at 6.  Regarding the access road, the 2015 Determination stated that the building of an access road by itself within the right-of-way would not require BLM Approval, but that it does not necessarily mean the pipeline would further a railroad purpose.  BLM at 2272.  Even if that conclusion were characterized as a change in legal position, the 2015 Determination also noted that ARZC already had access to the railroad via existing roads.  *See* BLM at 2271.  Finally, as to in-line power generation, the 2015 Determination remarked:

> Shortly after issuance of IM 2014-122, Cadiz, Inc. added an in-line power component, which utilizes the water flow in the pipeline to generate electricity for the Railroad. The component description does not explain how 20-foot wide turbines fit within a 15-foot wide trench corridor for a 7-foot diameter (or less) pipeline.

BLM at 2265.  The 2017 Determination does not address the size of the turbines.

At the June 20, 2019 hearing, Cadiz spent a significant portion of its time attacking the 2015 Determination for applying the purportedly incorrect legal standard set forth in the 2014 IM. Of course, the 2015 Determination is not before the Court, and if Cadiz and the BLM think the 2015 Determination was wrong for the reasons cited, the BLM should have expressed those reasons in the 2017 Determination.  *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) ("Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself.").  As discussed above, none of the BLM's explanations as to its reversal on the Cadiz Project discuss why the agency thought the 2014 IM was wrong.

Further, Cadiz argued that because the 2017 Determination referenced two letters from Cadiz, those letters somehow set forth a more fulsome explanation from the agency about why it was reversing course from the 2015 Determination.  The Court copies the relevant portion of the 2017 Determination below:

45

Dear Mr. Slater:

Thank you for your letters dated May 22, 2017, and July 17, 2017, cosigned by Santa Margarita Water District General Manager Dan Ferons regarding the Bureau of Land Management's (BLM's) October 2015 administrative determination for the Cadiz Valley Water Conservation, Recovery and Storage Project (Cadiz Project) proposed by Cadiz, Inc.  In response to your specific inquiries:

- The October 2015 administrative determination is no longer an accurate representation of the BLM's view of the applicable law and facts, and therefore is expressly superseded by this letter.

- In light of further review of the relevant law, the BLM concludes that authorizing the proposed activity falls within the scope of rights granted to the Arizona and California Railroad (ARZC) under the General Railroad Right-of-Way Act of March 3, 1875 (1875 Act), and therefore does not require authorization by BLM.

*See* BLM 4.  Saying, "[t]hank you for your letters," is a far cry from explaining what information set forth in those letters convinced the agency to change its mind about the alleged railroad purposes in the Cadiz Project.  Cadiz argued that the Court must review the facts in those letters to determine the agency's course of action, but the Court disagrees with Cadiz's proposed standard. It is incumbent upon the agency to provide an explanation for why it reversed course.  *See Organized Village of Kake*, 795 F.3d at 966.  Moreover, as discussed at the hearing, the facts set out in the 2017 letters were mostly the same as those the BLM had prior to making the 2015 Determination.  The agency must therefore describe why it considered the same facts in 2015 and 2017 but came to opposing conclusions about whether such facts demonstrated any railroad purpose consistent with the incidental use doctrine.  In sum, the Court would hold that the BLM had the duty to provide a reasoned explanation for why it disregarded certain facts from the 2015 Determination in its conclusion that the component parts of the Cadiz Pipeline furthered railroad purposes.  Because the 2017 Determination provided no explanation for reversal, the Court would find it arbitrary and capricious.

E.  NEPA

Lastly, both sets of Plaintiffs argue that the 2017 Determination itself is a "major Federal action[] significantly affecting the quality of the human environment," and thus subject to NEPA environmental analysis.  *See, e.g.*, Centers MSJ 24-25 (quoting 42 U.S.C. § 4332(2)(C)).  Plaintiffs assert that the BLM was required (but failed) to conduct an EIS or EA about its decision that the Cadiz project fell within the right-of-way.  *Id.*  The BLM responds that because it determined that

46

the pipeline fell within the right-of-way it was not necessary for the BLM to approve the project, and therefore, the agency took no major federal action. *See* BLM MSJ at 24-25.

The Court is not sure whether it would need to reach this issue if it ultimately follows the decisions in this tentative ruling. Regardless, Plaintiffs have not directed the Court to any case in which an agency was required to complete an EIS for a project that it did not need to approve. *See* Centers MSJ at 24-25; NPCA MSJ at 24-25. The BLM meanwhile alerts the Court to various cases so holding. *See Alaska v. Andrus*, 591 F.2d 537, 541-42 (9th Cir. 1979); *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1243–44 (D.C. Cir. 1980); *Cross-Sound Ferry Services, Inc. v. ICC*, 934 F.2d 327, 334 (D.C. Cir. 1991) (agency finding that a ferry was exempt from regulation did not trigger NEPA), *abrogated on other grounds by Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83 (1998). Rd/

## IV.    Conclusion

Based on the foregoing discussion, the Court would conclude that the 2017 Determination was contrary to law and failed to explain its reversal from the 2015 Determination. The 2017 Determination therefore violated the APA. As such, the Court would DENY Defendants' motions for summary judgment, and GRANT Plaintiffs' motions for summary judgment to the extent they attacked the 2017 Determination. The Court would remand the matter to the BLM forthwith.